Judge ERDMANN
delivered the opinion of the court.
This case presents yet another issue arising from the prosecution of servicemembers for violating federal criminal statutes relating to child pornography in the wake of Ashcroft v. Free Speech Coalition, 535 U.S. 234, 122 S.Ct. 1389, 152 L.Ed.2d 403 (2002). Specialist Christopher Martinelli’s convictions are based upon violations of the Child Pornography Prevention Act of 1996 (CPPA), 18 U.S.C. § 2252A (2000), the same statute that we addressed in United States v. O’Connor, 58 M.J. 450 (C.A.A.F.2003), and in United States v. Mason, 60 M.J. 15 (C.A.A.F 2004).
Unlike the circumstances in O’Connor and Mason, however, the conduct underlying Martinelli’s conviction occurred outside the United States — specifically in Darmstadt, Germany. We granted review of this case to examine the question of whether the CPPA *54 applies to conduct engaged in outside the territorial boundaries of the United States when charged under clause 3 of Article 134, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 934 (2000).
We hold that the CPPA does not have extraterritorial application and therefore does not extend to Martinelli’s conduct in Germany. We further hold that Martinelli’s conduct under Specification 1 occurred in both Germany and the United States and therefore falls within the domestic application of the CPPA. We also hold that Martinelli’s plea to Specification 1 was not provident under O’Connor. Finally, although we have held that servicemembers can be prosecuted under clauses 1 and 2 of Article 134 for offenses involving “virtual” children, Martinelli’s guilty pleas to the CPPA-based specifications cannot be deemed provident to lesser included offenses under clauses 1 and 2 under the principles discussed in Mason, 60 M.J. at 18-20.

PROCEDURAL BACKGROUND

Martinelli entered guilty pleas and was convicted by general court-martial in April 2000 on four CPPA-based specifications under clause 3 of Article 134, UCMJ (sending, receiving, reproducing and possessing child pornography) and one specification of obstructing justice in violation of Article 134, UCMJ. He was sentenced by the military judge to a dishonorable discharge, confinement for three years, forfeiture of all pay and allowances and reduction to the lowest enlisted grade. In accordance with the terms of a pretrial agreement, the convening authority reduced the confinement to eighteen months, but approved the balance of the sentence.
Before the Army Court of Criminal Appeals, Martinelli argued that his child pornography conviction must be reversed because the statute underlying it was unconstitutionally vague and overbroad. Martinelli based this contention on a Ninth Circuit decision that had been granted certiorari but not yet decided by the United States Supreme Court. See Free Speech Coalition v. Reno, 198 F.3d 1083 (9th Cir.1999), cert. granted sub nom. Ashcroft v. Free Speech Coalition, 531 U.S. 1124, 121 S.Ct. 876, 148 L.Ed.2d 788 (2001). Prior to the Supreme Court issuing its decision, however, the Court of Criminal Appeals reviewed Martinelli’s case and summarily affirmed his conviction and sentence. United States v. Martinelli, No. Army 20000311 (A.Ct.Crim.App. Feb. 7, 2002) (unpublished).
Martinelli then petitioned this court for review of the Court of Criminal Appeals decision. By that time, the Supreme Court had upheld the Ninth Circuit ruling upon which Martinelli had based the challenge to his conviction. See Ashcroft v. Free Speech Coalition, 535 U.S. 234, 122 S.Ct. 1389, 152 L.Ed.2d 403 (2002). We granted review of Martinelli’s Issue I in which he challenged his CPPA-based convictions under clause 3 of Article 134 in light of Free Speech Coalition and we specified an issue addressing whether the CPPA had extraterritorial application.[1] Following argument on these initial issues,[2] the court ordered supplemental briefing on two additional issues related to the extrater *55 ritorial application of the CPPA.[3] The case was reargued with inclusion of the two additional issues.

FACTUAL BACKGROUND

Martinelli’s CPPA convictions are grounded in four discrete actions that he took with respect to images of “child pornography.” Beginning in January 1999 and continuing through January 2000, Martinelli downloaded images of child pornography from the Internet using computers located at the off-post Network Internet Café in Darmstadt, Germany. He would search Internet websites and log into Internet chat rooms in order to communicate with individuals willing to send him images. He would ultimately secure the images through one of two distinct routes: (1) he would receive materials via electronic mail (e-mail) sent by other individuals to email accounts that he maintained with either Yahoo! or Hotmail or (2) he would be directed by individuals to their respective web pages, from which Martinelli would secure the images directly. Under either scenario, he would download the images from the email attachments or web page contents to the hard drive of a computer at the Network Café. Martinelli received at least sixty-four images of child pornography in this fashion.
After receiving the images, Martinelli would copy them in order to distribute them to other individuals in the form of attachments to e-mail transmissions. He transmitted some of these images to other individuals via his Yahoo! and Hotmail accounts, sending approximately twenty such messages over the relevant time period.
Martinelli also copied the images from the hard drives of the computers at the Netzwork Café to a separate disk, which he then took back to his barracks at the Cambrai Fritsch Kaserne, a United States Army installation in Darmstadt, Germany. At the barracks he would either keep the images on the disk or load them onto the hard drive of his computer.
Martinelli was charged with the following violations of the CPPA under clause 3 of Article 134:
Specification 1: knowingly mailing, transporting or shipping child pornography in interstate or foreign commerce (by computer) in violation of § 2252A(a)(l) (specifically, sending images over the Internet from the Network Internet Café in Darmstadt, Germany);
Specification 2: knowingly receiving child pornography that has been mailed, shipped or transported in interstate or foreign commerce (by computer) in violation of § 2252A(a)(2)(A) (specifically, downloading images from the Internet in the Network Internet Café in Darmstadt, Germany); Specification 3: knowingly reproducing
child pornography for distribution through the mails, or in interstate or foreign commerce (by computer) in violation of § 2252A(a)(3) (specifically, downloading images from the Internet; copying them to hard drive and transmitting the copied files to approximately twenty individuals over the Internet in the Network Internet Café in Darmstadt, Germany);
Specification 4: knowingly possessing child pornography on land and in a building used by and under the control of the United States Government in violation of § 2252A(a)(5)(A) (specifically, possessing approximately fifty diskettes containing child pornography in bufldings at the Cambrai Fritsch Kaserne).

DISCUSSION

A. Standard of Review
This case involves a guilty plea. For this court to reject a guilty plea on appellate *56 review, the record of trial must show a substantial basis in law and fact for questioning the plea. United States v. Jordan, 57 M.J. 236, 238 (C.A.A.F.2002)(citing United States v. Prater, 32 M.J. 433, 436 (C.M.A.1991)). Whether Congress intended the CPPA to have extraterritorial application is a question of statutory interpretation. Interpretation of a statute and its legislative history are questions of law that we review de novo. United States v. Falk, 50 M.J. 385, 390 (C.A.A.F. 1999).
B. The Nature of the Charge under Article 13h
Martinelli’s conduct was charged as a violation of Article 134, UCMJ — the “General Article.” Conduct is punishable under Article 134 if it “prejudices good order and discipline in the armed forces” (clause 1), if it is “of a nature to bring discredit upon the armed forces” (clause 2), or if it is a crime or offense not capital (clause 3). O’Connor, 58 M.J. at 452. As was the case in both O’Connor and Mason, Martinelli’s conduct was specifically charged as a “clause 3” offense, with the CPPA serving as the “crime or offense not capital.”
The initial question that we specified for review is ostensibly straightforward — does the CPPA apply to Martinelli’s conduct in Germany? The President, in the Manual for Courts-Martial, has stated that: Manual for Courts-Martial, United States (2002 ed.) (MCM), pt. IV, H 60.c.(4)(c)(i) (emphasis added). As a uniformed servicemember stationed in Germany, Martinelli was unquestionably subject to the jurisdiction of the UCMJ. See Articles 2(a)(1) and 5, UCMJ, 10 U.S.C. §§ 802(a)(1), 805 (2000). There is also no question that the CPPA, if charged under clause 3 of Article 134, would be applicable to Martinelli’s conduct had he engaged in these acts in an Internet cafe in Killeen, Texas and then carried the disks back to a barracks room on Fort Hood. Similarly, his conduct might well be punishable under clauses 1 and 2 of Article 134 regardless of where it occurred.
A person subject to the [UCMJ] may not be punished under clause 3 of Article 134 for an offense that occurred in a place where the law in question did not apply. For example, a person may not be punished under clause 3 of Article 13Jp when the act occurred in a foreign country merely because that act would have been an offense under the United States Code had the act occurred in the United States. Regardless where committed, such an act might be punishable under clauses 1 or 2 of Article 134.
The question we address today is not the jurisdiction of the UCMJ itself, but rather whether the CPPA has extraterritorial application under clause 3 of Article 134.[4] If we find that the CPPA, as a “crime or offense not capital,” is not applicable to Martinelli’s conduct in Germany, we must then consider whether, due to the nature of his usage of the Internet, his conduct fell within the domestic application of the CPPA. To the extent that we find that Martinelli’s conduct fell within the domestic application of the CPPA, we must then consider whether his guilty pleas were provident in light of O’Connor. Finally, if we find that Martinelli’s pleas were improvident under clause 3 of Article 134 for either reason, we must determine whether they would be provident to lesser included offenses under clauses 1 or 2 of Article 134.
C. The Extraterritorial Application of the CPPA
(1) Presumption Against Extraterritoriality
The extraterritorial application of Federal statutes does not involve any question as to Congress’ authority to enforce its criminal laws beyond the territorial boundaries of the United States — Congress clearly has that authority. United States v. Bowman, 260 U.S. *57 94, 98-103, 43 S.Ct. 39, 67 L.Ed. 149 (1922). Rather, the question here is whether Congress has in fact exercised that authority, which is a matter of statutory construction. Equal Employment Opportunity Commission v. Arabian American Oil Co. (Aramco), 499 U.S. 244, 248, 111 S.Ct. 1227, 113 L.Ed.2d 274 (1991).
The Supreme Court has recognized as a longstanding principle of American law “ ‘that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States.’” Id. (quoting Foley Bros. v. Filardo, 336 U.S. 281, 285, 69 S.Ct. 575, 93 L.Ed. 680 (1949)); see also Small v. United States, 544 U.S. 385, 125 S.Ct. 1752, 1755, 161 L.Ed.2d 651 (2005). We must assume that Congress legislates against the backdrop of the presumption against extraterritoriality. Aramco, 499 U.S. at 248, 111 S.Ct. 1227. Unless the “affirmative intention” of Congress to give extraterritorial effect to a statute is “clearly expressed,” it is presumed that the statute is “primarily concerned with domestic conditions.” Id. (quoting Benz v. Compania Naviera Hidalgo, S.A., 353 U.S. 138, 147, 77 S.Ct. 699, 1 L.Ed.2d 709 (1957) and Foley Bros., 336 U.S. at 285, 69 S.Ct. 575).
The presumption against extraterritoriality has been recognized in the specific context of criminal statutes, with an “exception” for a certain class of offenses:
Crimes against private individuals or them property, like assaults, murder, burglary, larceny, robbery, arson, embezzlement, and fraud of all kinds, which affect the peace and good order of the community, must of course, be committed within the territorial jurisdiction of the government where it may properly exercise it. If punishment of them is to be extended to include those committed outside of the strict territorial jurisdiction, it is natural for Congress to say so in the statute, and failure to do so will negative the purpose of Congress in this regard----
But the same rule of interpretation should not be applied to criminal statutes which are, as a class, not logically dependent on their locality for the Government’s jurisdiction, but are enacted because of the right of the Government to defend itself against obstruction, or fraud wherever perpetrated, especially if committed by its own citizens, officer or agents. Some such offenses can only be committed within the territorial jurisdiction of the Government because of the local acts required to constitute them. Others are such that to limit their locus to the strictly territorial jurisdiction would be greatly to curtail the scope and usefulness of the statute and leave open a large immunity for frauds as easily committed by citizens on the high seas and in foreign countries as at home. In such cases, Congress has not thought it necessary to make specific provision in the law that the locus shall include the high seas and foreign countries, but allows it to be inferred from the nature of the offense.
Bowman, 260 U.S. at 98, 43 S.Ct. 39. We have previously characterized Bowman as drawing a distinction between:
(1) statutes punishing crimes against the peace and good order of the community (which apply only to [acts] committed within the territorial jurisdiction of the United States unless Congress had specifically directed otherwise); and (2) statutes punishing fraud or obstructions against the United States Government (which include by implication acts which were committed in foreign countries).
United States v. Gladue, 4 M.J. 1, 5 (C.M.A. 1977).
The principles articulated by the Supreme Court in Aramco and Bowman can be harmonized to provide the following analytical framework for assessing whether the CPPA was intended to have extraterritorial effect: Unless the CPPA can be viewed as falling within the second category described in Bowman (“criminal statutes which are, as a class, ... enacted because of the right of the government to defend itself against obstruction, or fraud wherever perpetrated,” 260 U.S. at 98, 43 S.Ct. 39), the statute is subject to the presumption against extraterritoriality recognized in both Bowman and Aramco.
*58 We do not believe that the CPPA can be viewed as a “second category” offense under Bowman and thus exempt from application of the presumption against extraterritoriality. The ultimate objective behind the criminal proscription of activities pertaining to child pornography is to protect children from abuse. Free Speech Coalition, 535 U.S. at 245, 122 S.Ct. 1389. While few crimes are more serious or morally repugnant, child abuse does not involve “fraud” or “obstruction” against the United States Government. Rather, child abuse epitomizes that class of “[cjrimes against private individuals [including children]” that “affect the peace and good order of the community” described in the first category of Bowman. 260 U.S. at 98, 43 S.Ct. 39.
We are aware of the body of law, primarily from the Ninth Circuit, that does not read the second category in Bowman as limited to crimes against the Government. See, e.g., United States v. Vasquez-Velasco, 15 F.3d 833, 839 n. 4 (9th Cir.1994); United States v. Thomas, 893 F.2d 1066, 1068 (9th Cir.1990). Those cases all trace their roots, in one fashion or another, back to United States v. Baker, 609 F.2d 134, 136 (5th Cir.1980), where the Fifth Circuit read Bowman as allowing a court, in the absence of any expression of congressional intent, to “infer” Congress’ intent to provide for extraterritorial application “from the nature of the offenses and Congress’ other legislative efforts to eliminate the type of crime involved.”[5] The Baker court concluded that a federal statute prohibiting drug possession with intent to distribute fell within “the second category described in Bowman” and thus was intended to apply extraterritorially. Id. at 137.
The holding in Baker has been subsequently used to support the “inference” of a congressional intent for extraterritorial application in several circumstances that do not involve crimes against the Government, including child pornography-related offenses. See, e.g., United States v. Harvey, 2 F.3d 1318, 1327 (3d Cir.1993)(sentencing guidelines for child pornography offenses); Thomas, 893 F.2d at 1068-69 (production of child pornography under 18 U.S.C. § 2251). We disagree, however, with Baker s expanded view of the “second category” offenses in Bowman. The phrase “inferred from the nature of the offense” in Bowman was clearly cast in reference to the “class” of criminal statutes involving fraud or obstruction against the Government and is not a free standing principle of statutory construction:
But the same rule of interpretation should not be applied to criminal statutes which are, as a class, not logically dependent on their locality for the Government’s jurisdiction, but are enacted because of the right of the Government to defend itself against obstruction, or fraud wherever perpetrated, especially if committed by its own citizens, officers or agents.... In such cases, Congress has not thought it necessary to make specific provision in the law that the locus shall include the high seas and foreign countries, but allows it to be inferred from the nature of the offense.
260 U.S. at 98, 43 S.Ct. 39.[6]
Accordingly, we adhere to the view we originally expressed in Gladue. The only category of offenses exempt under the language of Bowman from any presumption against extraterritoriality and for which a congressional intent for extraterritorial application can be “inferred from the nature of the offense” are those involving “obstructions” and “frauds” against the Government. See United States v. Gatlin, 216 F.3d 207, 211 n. 5 (2d Cir.2000).
*59 (2) Indicia of Congressional Intent
Our conclusion that the CPPA is subject to a presumption against extraterritoriality under Aramco and Bowman does not end our inquiry into its applicability. We now “look to see whether ‘language in the [relevant statute] gives any indication of a congressional purpose to extend its coverage beyond places over which the United States has sovereignty or has some measure of legislative control.’ ” Aramco, 499 U.S. at 248, 111 S.Ct. 1227 (quoting Foley Bros., 336 U.S. at 285, 69 S.Ct. 575). In searching for the clear expression of congressional intent required by Aramco, we are not limited to the text of the statute and can “consider ‘all available evidence’ about the meaning of the statute, including its text, structure, and legislative history.” Gatlin, 216 F.3d at 212 (quoting Sale v. Haitian Ctrs. Council, Inc., 509 U.S. 155, 177, 113 S.Ct. 2549, 125 L.Ed.2d 128 (1993)).
(a) Text and Structure
Our reading of the CPPA does not find any indication in the text and structure of the statute of a congressional purpose to extend its coverage. See Bradley Scott Shannon, The Jurisdictional Limits of Federal Criminal Child Pornography Law, 21 Hawaii L.Rev. 73, 106 (1999) (noting that the language of the CPPA “do[es] not clearly express an intent” that the statute is to apply extraterritorially). The text and structure of the statute prohibits five categories of conduct:
• mailing, transporting or shipping child pornography in interstate or foreign commerce by any means, including by computer (18 U.S.C. § 2252A(a)(l));
• receipt or distribution of child pornography that has been mailed, shipped or transported in interstate or foreign commerce by any means, including by computer (18 U.S.C. § 2252A(a)(2)(A), (B));
• reproduction of child pornography for distribution by mail or interstate or foreign commerce, including by computer (18 U.S.C. § 2252A(a)(3)(A));
• sale or possession with intent to sell of (1) child pornography that has moved in interstate or foreign commerce by any means, including by computer or was produced using materials that have moved in commerce or (2) any child pornography “in the special maritime and territorial jurisdiction of the United States, or on any land or building owned by, leased to, or otherwise used by or under the control of the United States Government, or in the Indian country (as defined in section 1151)....” (18 U.S.C. § 2252A(a)(4)(A), (B)); and
• possession of (1) child pornography that has moved in interstate or foreign commerce by any means, including by computer or was produced using materials that have moved in commerce or (2) any child pornography “in the special maritime and territorial jurisdiction of the United States, or on any land or building owned by, leased to, or otherwise used by or under the control of the United States Government, or in the Indian country (as defined in section 1151)....” (18 U.S.C. § 2252A(a)(5)(A), (B)).
The criminal acts in the first three subsections all refer to the movement of child pornography “in interstate or foreign commerce,” whether it be the act of moving the material itself (§ 2252A(a)(l)) or the acts of receiving, distributing or reproducing for distribution materials that have moved in that fashion (§ 2252A(a)(2)-(3)).
The criminal acts in the final two subsections are sale, possession with intent to sell, and simple possession. Under these subsections, criminal liability can attach under either of two separate circumstances. The first involves the same “interstate or foreign commerce” context attendant to the offenses in § 2252A(a)(l)-(3). The second circumstance is purely dependent on physical location or the “situs” of the defendant — if the requisite act occurs “in the special maritime and territorial jurisdiction of the United States, or on any land or building owned by, leased to or otherwise used by or under the *60 control of the United States Government,” it does not matter whether the child pornography ever moved in commerce. See § 2252A(a)(4)(A), (5)(A).
There are two aspects of the statutory language in § 2252A(a)(l)-(a)(5) that could possibly be read as expressing congressional intention as to extraterritorial effect — (1) the references to “interstate or foreign commerce” and (2) the situs language in § 2252A(a)(4)(A), (a)(5)(A). In terms of the former, they are not, in and of themselves, a “clear expression” of any congressional intention that the acts proscribed by the statute constitute a federal crime no matter where in the world they occur. Rather, we view them as a straightforward reference to the source authority of Congress for proscribing these acts as criminal in the first instance, i.e., the Commerce Clause of the United States Constitution:
Many Acts of Congress are based on the authority of that body to regulate commerce among the several States, and the parts of these Acts setting forth the basis for legislative jurisdiction will obviously refer to such commerce in one way or another. If we were to permit possible, or even plausible, interpretations of language such as that involved here to override the presumption against extraterritorial application, there would be little left of the presumption.
Aramco, 499 U.S. at 253, 111 S.Ct. 1227. The use of the term “foreign commerce” in addition to “interstate commerce” does not alter that conclusion, as the Supreme Court “has repeatedly held” that even statutes that expressly refer to “foreign commerce” do not apply abroad. Id. at 251, 111 S.Ct. 1227.
That leaves the situs language in §§ 2252A(a)(4)(A) and 2252A(a)(5)(A) as a possible basis for overcoming the presumption against extraterritoriality. There are three alternative locations referenced in the statute:
• “the special maritime and territorial jurisdiction of the United States”; or
• “any land or building owned by, leased to, or otherwise used by or under the control of the United States Government”; or
• “the Indian country” (as defined in 18 U.S.C. § 1151).
The reference to Indian country reflects a congressional focus on complex jurisdictional issues that flow from the unique, and inherently domestic, relationship between the United States Government and American Indians. It certainly does not reflect any clear legislative concern for matters arising outside the territorial boundaries of the United States.
The term “special maritime and territorial jurisdiction of the United States” is, like “Indian country,” a term of art that carries its own distinct definition. See 18 U.S.C. § 7 (2000). That term of art has been the subject of different interpretations as to its extraterritorial reach, particularly whether it extends to lands within the territory of a sovereign foreign nation. See, e.g., United States v. Corey, 232 F.3d 1166, 1183 (9th Cir.2000)(term includes property inside Yokota Air Base in Japan and private apartment building rented by United States embassy in Philippines); Gatlin, 216 F.3d at 220 (term does not include housing complex on U.S. Army base in Darmstadt, Germany).
We conclude that the depth and complexity of the debate reflected in Corey and Gatlin inherently demonstrates something less than a “clear expression” of congressional intention that the term “special maritime and territorial jurisdiction of the United States” extends to lands inside the boundaries of a foreign nation. Further, Congress has since acted to resolve the specific subject of the debate in Corey and Gatlin, which was narrowly focused on the reach of certain federal criminal statutes to conduct engaged in overseas by civilians employed by or accompanying the armed forces. See Military Extraterritorial Jurisdiction Act of 2000, Pub.L. No. 106-523, 114 Stat. 2488 (codified at 18 U.S.C. § 3261) (MEJA). Congress used MEJA to create a new federal criminal offense involving conduct engaged in “outside the United States” that would otherwise constitute a felony if the conduct had been engaged in “within the special maritime and territorial *61 jurisdiction of the United States.” 18 U.S.C. § 3261(a) (2000).[7]
The remaining situs language refers to conduct occurring “on any land or building owned by, leased to, or otherwise used by or under the control of the United States Government.” That language undoubtedly reflects a congressional intent to criminally proscribe conduct in physical locations where the United States Government enjoys some type of proprietary control over the location. The language, however, does not provide clear evidence of a congressional intent that the statute should apply outside the boundaries of the United States. That language could just as easily apply only to land and buildings located within the territorial United States such as national parks, federal office buildings and domestic military installations.
We also note that the language concerning “land or building” does not stand alone, but is instead bracketed by language dealing with the “special maritime and territorial jurisdiction of the United States” and “the Indian country (as defined in section 1151).” Under the canon of statutory construction noscitur a sociis (a word is known by the company it keeps), it is reasonable to conclude that Congress intended the “land or building” language to have the same domestic application as evidenced in the surrounding language. See Amgen Inc. v. Smith, 357 F.3d 103, 112-13 (D.C.Cir.2004) (applying the canon of noscitur a sociis to support consistent interpretation of separate phrases within a statutory section); In re Application of the United States for an Order Authorizing the Roving Interception of Oral Communications, 349 F.3d 1132, 1142-43 (9th Cir.2003) (using the canon of noscitur a sociis to interpret a section of the federal wiretapping statute); see also United States v. Hicks, 6 C.M.A. 621, 623, 20 C.M.R. 337, 339 (1956).
We do not view the statutory phrases discussed above, either individually or collectively, as the type of “clear expression” of congressional intention required by Aramco. The analysis dictated by Bowman and Aramco requires that the statutory text reflect a clear expression of Congress’ intent that the statute have extraterritorial reach. Aramco, 499 U.S. at 248, 111 S.Ct. 1227. The language must be clear enough to overcome a presumption that it was intended to apply domestically, not simply lend itself to a plausible argument that it applies overseas. Mere plausibility is not sufficient to overcome the presumption. Id. In the context of that presumption, we do not view the “any land or building” language of §§ 2252A(a)(4)(A) and 2252A(a)(5)(A) as a “clear expression” by Congress that it have extraterritorial application.
(b) Legislative History
Having concluded that the text and structure of the CPPA do not express any clear intent by Congress that the statute apply extraterritorially, we reach the same conclusion with respect to its legislative history. The clear focus of that legislative history is on the patent evils of child pornography and the new dimension that computer technology adds to those evils. See Congressional Findings, notes following 18 U.S.C.A. § 2251, 18 U.S.C.S. 2251. Although the history contains extensive discussion of those issues, it is devoid of any reference to issues of extraterritoriality, much less any clear expression of congressional intent in that regard. See S.Rep. No. 104-358, at 12-23 (1996).
(c) Examples of Clear Congressional Intent
Our conclusion regarding the absence of any clearly expressed intent by Congress that the CPPA apply extraterritorially is bolstered by the numerous instances where such intent has been clearly expressed. Even in the specific context of child pornography, Congress knows how to makes its intention clear that a particular criminal statute extend to conduct engaged in outside the United States. See, e.g., 18 U.S.C. § 2260(b)(“a person who, outside the United States, knowingly receives, transports, ... any visual depiction of a minor engaging in sexually explicit conduct ... intending that the visual depiction will be imported into *62 the United States”); 18 U.S.C. § 2251(c)(l)(“[a]ny person who ... employs, uses, ... any minor to engage in, or who has a minor assist any other person to engage in, any sexually explicit conduct outside of the United States”).
Congress has clearly expressed its intent in other criminal statutes as well: the Biological Weapons Anti-Terrorism Act of 1989 provides, “There is extraterritorial federal jurisdiction over an offense under this section committed by or against a national of the United States,” 18 U.S.C. § 175(a) (2000); the Maritime Drug Law Enforcement Act provides, “This section is intended to reach acts of possession, manufacture, or distribution committed outside the territorial jurisdiction of the United States.” 46 U.S.C. app. § 1903(h) (2000).
Congress also amended 18 U.S.C. § 7 (2000), which defines the “special maritime and territorial jurisdiction” of the United States, as part of the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (USA PATRIOT Act), Pub.L. No. 107-56,115 Stat. 272 (2001). The USA PATRIOT Act amendments inserted a new provision that, with respect to “offenses committed by or against a national of the United States,” extends the special maritime and territorial jurisdiction of the United States under 18 U.S.C. § 7 to the “premises of ... diplomatic, consular, military or other ... missions ... in foreign States____” USA PATRIOT Act § 804 (codified at 18 U.S.C. § 7(9)(A)). This is a clear expression of congressional intent that a crime committed in “the special maritime and territorial jurisdiction” now includes conduct that may in some instances have occurred inside the boundaries of a foreign nation.
Finally, we note Congress’ ability to make its intentions in this regard clear with respect to a broad range of criminal acts rather than a single crime. In legislation proscribing “[a]cts of terrorism transcending national boundaries,” Congress has provided that the statute extends to “conduct occurring outside of the United States in addition to conduct occurring inside of the United States” and that “[tjhere is extraterritorial Federal jurisdiction” over the wide range of offenses described in the statute. See 18 U.S.C. § 2332(e), (g)(1) (2000). These examples of express congressional intent constitute various indicia, none of which are present with respect to the CPPA.
To reach the conclusion urged by the Government, that Congress intended the CPPA to criminalize conduct inside the boundaries of sovereign foreign countries,[8] we would have to disregard the Bowman and Aramco presumption and the absence of these indicia. The rules of statutory construction laid down by the Supreme Court simply do not support that conclusion.
Accordingly, we cannot view the CPPA as overcoming the presumption against extraterritorial application dictated by Bowman and Aramco. The charges against Martinelli fall squarely within the example the President described in the Manual for Courts-Martial, i.e., “a person may not be punished under clause 3 of Article 134 when the act occurred in a foreign country merely because that act would have been an offense under the United States Code had the act occurred in the United States.” MCM, pt. IV, U 60.c.(4)(c)(i). As a result, there is a substantial basis in law and fact for viewing Martinelli’s guilty pleas to the CPPA-based clause 3 offenses under Article 134 for conduct occurring in Germany as improvident.
D. The Domestic Application of the CPPA
Martinelli stipulated that all of the e-mails that he sent or received at his Yahoo! or Hotmail e-mail accounts were electronically routed through the servers in the United *63 States.[9] This connection to the United States raises the possibility that the CPPA could be applied domestically to the three specifications that were based upon e-mail messages sent or received through Martinelli’s e-mail accounts.[10] Martinelli argues that in each specification, the charge sheet alleges that the conduct occurred only “at or near Darmstadt, Germany” and therefore the Government put him on notice that the misconduct occurred in Germany. He argues that the situs of the offenses was in Germany and the fact that the material may have been routed through an Internet server located in the United States does not transform what was an extraterritorial act into a domestic act.
The Government responds that there was more than one situs for Martinelli’s misconduct and that the prosecution was proper under either a domestic or extraterritorial application of the CPPA. The Government contends that because the Internet server was located in the United States and due to the continuing nature of the offenses involved (sending, receiving, and reproducing child pornography) a part of each offense was committed in the United States. Therefore the Government argues that a domestic application of the CPPA is proper. The Government cites United States v. Moncini, 882 F.2d 401 (9th Cir.1989), in support of its position.
In Moncini, a citizen and resident of Italy was arrested as he entered the United States and was tried in the United States District Court for the Central District of California for mailing child pornography from Italy to an undercover officer in California in violation of 18 U.S.C. § 2252. Moncini, 882 F.2d at 403. Prior to his trial Moncini filed a motion to dismiss the indictment for lack of personal jurisdiction. The trial court denied his motion on the ground that the mailings were “continuing offenses which continued to take place as Moneini’s letters traveled from Italy to California, giving the court territorial jurisdiction.” Id. The trial court found, in the alternative, that extraterritorial jurisdiction would be proper. Id.
Moncini was convicted and on appeal he again urged a lack of jurisdiction. The Ninth Circuit affirmed the lower court’s decision explaining that “[¿jurisdiction is proper if the offense, or part of the offense, occurred within the United States.” Id. (citing Rocha v. United States, 288 F.2d 545, 547 (9th Cir. 1961)). The court went on to explain that “Moncini’s mailing of child pornography was a continuing offense, so that part of the offense was committed in the United States as his letters traveled through the mail and were delivered to their destination.” Id. The court “reject[ed] Moncini’s argument that the crime was complete at the time the letter was deposited in the mail in Italy.” Id. The Ninth Circuit did not reach the question of extraterritoriality.
The obvious distinction between Moncini and this case is that in this case the child pornography flowed through the Internet rather than through the mails. The statute, however, is not limited to “mail” but includes “mail, transport or ship” and as such includes material routed through the Internet. It can not be disputed that for purposes of sending and receiving communications, the Internet e-mail system is rapidly becoming the 21st century equivalent of the 20th century postal system. The domestic application of the CPPA is therefore possible under the “continuing offense” theory for Specifications 1-3. As each specification alleges different misconduct, each must be examined individually.
Specification 1 (sending): This specification charged that Martinelli used “electronic mail to send electronic files containing child pornography through the Internet”. We agree with the Ninth Circuit that “sending” child pornography is a continuing of *64 fense that continues as the e-mail travels through the Internet to its destination. In this case those travels included a routing through servers located in the United States. As a result, a domestic application of the CPPA to Specification 1 is appropriate. Moncini, 882 F.2d at 403.
Specification 2 (receiving): This specification charged that Martinelli received “child pornography that had been ... transported ... by means of a computer to wit: downloading electronic files containing child pornography from the Internet.” Unlike the “sending” specification, Martinelli’s acts of receiving the child pornography were not the start of any conduct that continued into the United States. His conduct in “receiving” the e-mails occurred in Germany only and there can be no domestic application of the CPPA to this specification.[11]
Specification 3 (reproducing): This specification charged that Martinelli “reproduced by means of a computer child pornography for distribution ... by downloading from the Internet electronic files ... copying said files to computer diskettes and sending the copied files ... by electronic mail.”[12] Similar to the “receipt” specification, in reproducing for distribution, Martinelli commenced no conduct that continued into the United States and there can be no domestic application of the CPPA.
In summary, we find that while Specification 1 involves conduct that continued into the United States and therefore provides for the domestic application of the CPPA, Specifications 2 and 3 involve conduct that is not continuing in nature and do not provide for the domestic application of the CPPA.
E. The Providence of Martinelli’s Guilty Plea to Specification 1
Having determined that the CPPA is domestically applicable to Specification 1, and therefore finding no basis to question Martinelli’s plea to Specification 1 on extraterritoriality grounds, we must now determine whether Martinelli’s guilty plea to that specification was provident under O’Connor, 58 M.J. at 453-60.
(1) The Providence Inquiry and Record of Trial
Under Specification 1, Martinelli was charged with violation of the CPPA as a “crime or offense not capital” under clause 3 of Article 134. The military judge explained to Martinelli that clause 3 of Article 134 prohibits the commission of crimes and offenses not capital and that he had been charged with violation of 18 U.S.C. § 2252A. The military judge went on to explain the elements of knowingly and wrongfully mailing, transporting or shipping child pornography by using electronic mail to send electronic files containing child pornography through the Internet, which Martinelli acknowledged he understood. The military judge then read Martinelli the definition of several terms that were used in 18 U.S.C. § 2252A, including the definition of child pornography, which the military judge noted was found in 18 U.S.C. § 2256. The military judge defined “child pornography” as follows:
*65 [A]ny visual depiction, including any photograph, film, video, picture, or computer, or computer-generated image or picture, whether made or produced by electronic, mechanical, or other means of sexually explicit conduct, where:
(A) the production of such visual depiction involves the use of a minor engaging in sexually explicit conduct;
(B) such visual depiction is, or appears to be, of a minor engaging in sexually explicit conduct;
(C) such visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaging in sexually explicit conduct; or
(D) such visual depiction is advertised, promoted, presented, described, or distributed in such a manner that conveys the impression that the material is or contains a visual depiction of a minor engaged in sexually explicit conduct.
The military judge did not inquire as to whether Martinelli believed that his conduct was either prejudicial to good order and discipline or service discrediting. As in O’Con-nor, the military judge’s use of the pre-Free Speech Coalition definition of “child pornography” properly reflected the law at the time of trial. His failure to inquire into the “actual” or “virtual” distinction or discuss the possible “service discrediting” or “prejudicial to good order and discipline” characteristics was perfectly understandable. O’Connor, 58 M.J. at 453.
(2) The Providence of the Plea Under Clause 3
In O’Connor this court reviewed a guilty plea to a clause 3 Article 134 CPPA offense in light of the Supreme Court’s decision in Free Speech Coalition:
In Free Speech Coalition, the Supreme Court determined that certain portions of the § 2256(8) definition are unconstitutional, specifically the “or appears to be” language of § 2256(8)(B), and the entirety of § 2256(8)(D). 535 U.S. at 256, 258[, 122 S.Ct. 1389], In striking the former, the Court specifically discussed the distinction between “virtual” child pornography and “actual” pornography and concluded that the rationales for restricting pornographic materials involving actual children do not extend to computer-generated simulations or images. Id. at 249-56[, 122 S.Ct. 1389]. The Supreme Court concluded that the First Amendment prohibits any prosecution under the CPPA based on “virtual” child pornography.
Prior to Free Speech Coalition, knowing possession and receipt of images of child pornography, virtual or actual, was sufficient to establish one of the factual predicates for a plea of guilty under the CPPA. The “virtual” or “actual” character of the images was not, in and of itself, a factual predicate to a guilty plea — criminal liability could arise under either circumstance ____ In the wake of Free Speech Coalition, the relevant provisions of 18 U.S.C. § 2256(8) require that the visual depiction be of an actual minor engaging in sexually explicit conduct. The “actual” character of the visual depictions is now a factual predicate to any plea of guilty under the CPPA.
58 M.J. at 452-53 (internal footnote omitted).
Similar to the situation in O’Connor, the definition used by the military judge in this case included those portions of the definition later struck down by the Supreme Court in Free Speech Coalition. The military judge did not discuss those aspects of the CPPA that were not affected by the Supreme Court’s ruling, i.e., “actual” child pornography under 18 U.S.C. § 2256(8)(A), (B) or “computer morphed” images of an identifiable minor under § 2256(8)(C). O’Connor, 58 M.J. at 452. As we noted in Mason:
Under our decision in O’Connor, a provident guilty plea to a violation of the CPPA must reflect that the accused violated those portions of the statute not affected by the Supreme Court’s ruling in Free Speech Coalition. 58 M.J. at 454. The absence of any focus on or discussion concerning those aspects of the statute in the present record coupled with the use of the unconstitutionally overbroad definition *66 during Mason’s plea colloquy render this case indistinguishable from O’Connor.
60 M.J. at 18.
Similarly, and for the same reasons, the absence of any focus on the “actual” versus “virtual” nature of the images, the use of the unconstitutional definition of “child pornography,” and the absence of anything in the record that would demonstrate that Martinelli pled guilty to a constitutionally defined violation of federal law, we find Martinelli’s guilty plea to Specification 1 improvident.
F. The Possibility of Lesser Included Offenses
The improvidence of Martinelli’s pleas under clause 3 does not end our inquiry — an improvident plea to a CPPA-based clause 3 offense may, under certain circumstances, be upheld as a provident plea to a lesser included offense under clauses 1 or 2 of Article 134. Mason, 60 M.J. at 18-19; O’Connor, 58 M.J. at 454. The only question is whether those circumstances are present in Martinelli’s case.[13]
The nature of the defects in Martinelli’s clause 3 pleas in regard to Specification 1 and in regard to Specifications 2, 3 and 4 are different. In Specification 1 the defect, similar to O’Connor and Mason, involved the impact of the Supreme Court’s decision in Free Speech Coalition on the CPPA offense. The defect with respect to Specifications 2, 3 and 4 involves the threshold question of whether the CPPA applies to Martinelli’s conduct in the first instance.
We conclude, however, that any qualitative difference in the nature of the plea defect does not preclude the potential availability of a lesser included offense under these circumstances. As noted in the Manual for Courts-Martial, conduct that may not constitute a violation of clause 3 in a foreign country may still be punishable under clauses 1 and 2. See MCM, pt. IV. 1Í 60.c.(4)(c)(i).
In O’Connor we recognized that after Free Speech Coalition the possession and receipt of “virtual” child pornography is protected speech under the First Amendment:
The Supreme Court has now extended a cloak of First Amendment protection to certain depictions of minors engaging in sexually explicit conduct. Accordingly, the question of whether or not the possession of such visual depictions can be viewed as service discrediting now has a constitutional dimension that was not at issue in Sapp or Augustine.[14]
58 M.J. at 454. We then explained that where the constitutional rights of a service-member could come into play, we will closely scrutinize the providence inquiry. If there are constitutional implications, we will require a more definite showing that the servicemember clearly understood which of his acts were prohibited and why those acts were service-discrediting or prejudicial to good order and discipline before we will find that an improvident plea to a CPPA-based clause 3 offense is a provident plea to a lesser included offense under clause 1 or 2. Id. at 455.
The difference between our review of a providence inquiry under the O’Connor standard and our review under the less strict Augustine/Sapp standard is a qualitative dif *67 ference. Although the understanding required of the servicemember remains the same, we require a clearer more precise articulation of the servicemember’s understanding under O’Connor than we require in the cases where the accused’s First Amendment rights are not implicated.
*66 "virtual” children but whether the providence inquiry was sufficient to sustain a conviction on a lesser included offense under clauses 1 or 2 of Article 134.
*67 Applying this stricter scrutiny, we examined the providence inquiry in O’Connor and determined that O’Connor’s plea was not provident to a lesser included offense under clause 2 of Article 134 because “[T]here was no specific discussion with Appellant concerning the service-discrediting character of his conduct, much less any constitutional implications his conduct may or may not have had.” O’Connor, 58 M.J. at 455.
The next year we used the same analysis in Mason, but reached a different conclusion about the providence of the pleas. 60 M.J. at 18-20. In Mason the military judge used the unconstitutional language but did not focus on or discuss the distinction between “virtual” or “actual” children. Id. at 18. The military judge did, however, discuss the character of the underlying conduct and Mason agreed that his conduct was both service-discrediting and prejudicial to good order and discipline. Id. at 19.
We held that the providence inquiry sufficiently established the nature of Mason’s conduct as service-discrediting or prejudicial to good order and discipline even in the absence of a discussion about the “virtual” or “actual” character of the images. Id. at 19-20. The difference between Mason and O’Connor was that the military judge in Mason specifically discussed the character of the underlying conduct and Mason agreed that his conduct was both service-discrediting and prejudicial to good order and discipline.
Given the constitutional implications, the critical inquiry here is whether the record reflects an appropriate discussion of and focus on the character of the conduct at issue as service-discrediting and/or prejudicial to good order and discipline. Id. at 19. In other words, the record must conspicuously reflect that the accused “clearly understood the nature of the prohibited conduct” as being a violation of clause 1 and clause 2, Article 134, apart from how it may or may not have met the elements of the separate criminal statute underlying the clause 3 charge. Id. (internal quotation marks omitted)(citing O’Connor, 58 M.J. at 455).
The present record does not support that type of determination. Martinelli’s plea inquiry and underlying stipulation of fact were directed solely at demonstrating how his conduct with respect to the child pornography met the elements of the CPPA. For example, during the plea inquiry the military judge set out the elements of each offense (e.g., (1) that the accused knowingly mailed, transported or shipped child pornography in interstate or foreign commerce, (2) that such action was wrongful, and (3) that the accused knew the nature of the images to be child pornography at the time of the offense). He then defined the term “child pornography” using the complete definition set out in 18 U.S.C. § 2556. After walking through the elements of the offense one at a time, the military judge then asked:
MJ: Trial Counsel, ... [d]o you have any concerns about whether or not the Court has correctly described the offense as to elements? Do you wish me to inquire about any further elements?
[Trial Counsel]: No, Your Honor.
MJ: Major Weir, do you believe there are any further elements that are not properly described in this offense, that the Court ought to inquire about?
[Defense Counsel]: No, sir.
There was no reference to or discussion during the providence inquiry of Martinelli’s conduct as service-discrediting or prejudicial to good order and discipline. The absence of this type of inquiry is even clearer when viewed in contrast with the inquiry concerning the separate obstruction of justice specification, where both the stipulation and discussion with the military judge make clear reference to the character of Martinelli’s conduct as service-discrediting and/or prejudicial to good order. Under these circumstances, we cannot view Martinelli’s guilty plea to the child pornography-related conduct as provident to a lesser included offense under clause 1 or clause 2 of Article 134.

*68
DECISION

The decision of the United States Army Court of Criminal Appeals as to Specifications 1 through 4 of the Charge and the sentence is reversed, but is affirmed in all other respects. The findings of guilty of Specifications 1 through 4 of the Charge and the sentence are set aside and the record of trial is returned to the Judge Advocate General of the Army for a rehearing on Specifications 1 through 4 and the sentence.[15] If a rehearing on Specifications 1 through 4 is deemed impracticable, Specifications 1 through 4 may be dismissed and a rehearing held on the sentence alone. Thereafter, the provisions of Articles 66(b) and 67(a), UCMJ, 10 U.S.C. §§ 866(b), 867(a) (2000), shall apply-

. On November 24, 2003 we granted review of the following issues:
I. WHETHER APPELLANT’S GUILTY PLEAS TO SPECIFICATIONS 1, 2, 3 AND 4 OF THE CHARGE WERE IMPROVIDENT BECAUSE THE MILITARY JUDGE PROVIDED AN UNCONSTITUTIONALLY OVERBROAD DEFINITION OF CHILD PORNOGRAPHY AND DID NOT CONDUCT AN ADEQUATE PROVIDENCE INQUIRY, AS REQUIRED BY UNITED STATES v. CARE, 18 U.S.C.M.A. 535, 40 C.M.R. 247 (1969), AND ITS PROGENY.
II. WHETHER 18 U.S.C. SECTIONS 2252A(a)(l)-(a)(3) AND (a)(5)(A) APPLY TO CONDUCT ENGAGED IN OUTSIDE THE TERRITORIAL LIMITS OF THE UNITED STATES WHEN CHARGED UNDER CLAUSE 3 OF ARTICLE 134, UCMJ.

. We first heard oral argument in this case at the United States Coast Guard Academy, New London, Connecticut, as part of this court’s "Project Outreach.” This practice was developed as part of a public awareness program to demonstrate the operation of a Federal Court of Appeals and the militaiy justice system.

. On October 22, 2004 we granted the additional specified issues:
III. WHETHER 18 U.S.C. §§ 2252A(a)(l)-(a)(3) APPLY TO AN INDIVIDUAL WHO SENDS, RECEIVES, AND REPRODUCES ELECTRONIC FILES CONTAINING CHILD PORNOGRAPHY AT AN INTERNET CAFÉ LOCATED OFF POST IN GERMANY.
IV. WHETHER 18 U.S.C. §§ 2252A(a)(l)-(a)(3) ARE BEING APPLIED DOMESTICALLY OR EXTRATERRITORIALLY WHEN E-MAILS CONTAINING CHILD PORNOGRAPHY ARE SENT THROUGH E-MAIL OR INTERNET SERVICE PROVIDER SERVERS LOCATED IN THE UNITED STATES.

. The question of the extraterritorial application of federal statutes has nothing to do with the jurisdiction of the federal courts. It is a question of substantive law, which turns on the intent of Congress that a particular statute have extraterritorial application. See Hartford Fire Ins. Co. v. California, 509 U.S. 764, 813, 113 S.Ct. 2891, 125 L.Ed.2d 612 (1993) (Scalia, J., dissenting).

. For a critical discussion of the roles of Congress, the Executive and the judiciary regarding the extraterritorial application of federal statutes, see Mark P. Gibney, The Extraterritorial Application of U.S. Law: The Perversion of Democratic Governance, The Reversal of Institutional Roles, and the Imperative of Establishing Normative Principles, 19 B.C. Int'l & Comp. L.Rev. 297, 308 (1996).

. We also note that the Baker concept of “inferring” extraterritorial intent based on the nature of the offense and Congress' other efforts to eliminate the type of crime involved could apply to almost any crime committed anywhere in the world. This would turn the presumption against extraterritorial application on its head where criminal statutes are involved.

. See also Glen R. Schmitt, Closing the Gap in Criminal Jurisdiction Over Civilians Accompanying the Armed Forces Abroad — A First Person Account of the Creation of the Military Extraterritorial Jurisdiction Act of 2000, 51 Cath. U.L.Rev. 55, 78, 113-14 (2001).

. Unless restricted by Congress, a statute with a clear congressional intent of extraterritorial effect, applies to foreign nationals as well as United States nationals. Such an interpretation raises international law concerns. See United States v. Delgado-Garcia, 374 F.3d 1337, 1344-45 (D.C.Cir.2004); see also id. at 1351-62 (Rogers, J., dissenting); Restatement (Third) of Foreign Relations Law of the United States §§ 401-03 (1987).

. We address only those instances where e-mails were routed through Martinelli’s U.S.-based email accounts. Martinelli did not stipulate, nor is there any evidence on the record, that he utilized U.S.-based servers when he downloaded child pornography directly from websites and we therefore do not address that issue.

. Specification 4 is the situs based possession charge and the specification did not allege movement through the Internet.

. With respect to the question of whether all of the e-mail messages in Martinelli's Yahoo! and Hotmail accounts were "resident” on Internet servers located in the United States, both Yahoo! and Hotmail (which is operated by MSN, a division of Microsoft Corp.) have significant international operations. See Yahoo! 2004 Annual Report, available at http://yhoo.client.shareholder.com/annual.cfm (follow "2004 Annual Report" hyperlink) (listing office locations in thirty-three cities around the world and noting that: "Our principal Web server equipment and operations are maintained in California and several other domestic and international locations."); Microsoft Fiscal Year 2004 Form 10-K, available at http://www.microsoft.com/msfi/sec.mspx (follow "Fiscal Year 2004 Form 10-K" hyperlink) (listing a European Operations Center in Dublin, Ireland and noting that: "Our facilities are fully used for current operations of all segments...."/. Martinelli stipulated only that his e-mail messages had been routed through setvers located in the United States. The record does not include any information about the servers on which his opened and unopened e-mail messages were stored.

. "Sending” is not an element of this offense, rather the offense is "reproducing for distribution" and the "sending” allegation was included to meet the “distribution” element.

. This court ruled, in United States v. James, 55 M.J. 297 (C.A.A.F.2001), that the CPPA was constitutional as applied to images of "virtual” children. The Supreme Court, however, ruled to the contrary in Free Speech Coalition and we are required to follow that precedent. The Supreme Court decision in Free Speech Coalition did not, however, address military-specific prohibitions in clauses 1 and 2 of Article 134. Accordingly, we have held that military personnel, unlike their civilian counterparts, can be prosecuted under clauses 1 and 2 of Article 134 for child pornography offenses involving "virtual" children. Mason, 60 M.J. at 16. Thus, the question we reach today is not whether military personnel can be prosecuted and punished for cases involving

. United States v. Sapp, 53 M.J. 90 (C.A.A.F. 2000), and United States v. Augustine, 53 M.J. 95 (C.A.A.F.2000), pre-dated Free Speech Coalition and dealt with the possibility of a lesser included offense under clause 2 of Article 134 where a guilty plea to a CPPA-based clause 3 Article 134 charge was found improvident. In those cases, where no constitutional considerations were involved, we found the pleas provident to a clause 2 Article 134 offense.

. Because of our decision in this case, Specifications 1 through 4 will necessarily have to be amended prior to any rehearing to allege lesser included offenses of conduct prejudicial to good order and discipline in the armed forces, or of a nature to bring discredit upon the armed forces in violation of clauses 1 and/or 2 of Article 134.