UNITED STATES, Appellee

v.

James S. PIREN, Private First Class
U.S. Army, Appellant

No. 14-0453

Crim. App. No. 20110416

United States Court of Appeals for the Armed Forces

Argued October 8, 2014

Decided January 15, 2015

ERDMANN, J., delivered the opinion of the court, in which BAKER, C.J., and STUCKY, RYAN, and OHLSON, JJ., joined.

<u>Counsel</u>

For Appellant:  Captain Robert H. Meek III (argued); Colonel Kevin M. Boyle, Lieutenant Colonel Jonathan F. Potter, and Major Amy E. Nieman (on brief).

For Appellee:  Captain Daniel H. Karna (argued); Colonel John P. Carrell, Lieutenant Colonel James L. Varley, and Major Steven J. Collins (on brief).

Military Judge:  Wendy Daknis

**This opinion is subject to revision before final publication.**

, No. 14-0453/AR

Judge ERDMANN delivered the opinion of the court.

Private First Class James S. Piren was charged with one specification of aggravated sexual assault and two specifications of abusive sexual contact, in violation of Article 120, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 920 (2006), and one specification of assault, in violation of Article 128, UCMJ, 10 U.S.C. § 928.  Piren entered pleas of not guilty to all charges and specifications.  Following arraignment, the military judge granted a defense motion to dismiss one specification of abusive sexual contact and the assault charge as being multiplicious.

A panel of officers sitting as a general court-martial acquitted Piren of aggravated sexual assault, but found him guilty of the remaining specification of abusive sexual contact. The panel sentenced him to a reduction to E-1, forfeiture of all pay and allowances, confinement for twelve months, and a bad-conduct discharge.  The convening authority credited Piren with fifteen days of pretrial confinement and approved the remaining sentence as adjudged.  The United States Army Criminal Court of Appeals (ACCA) summarily affirmed.  United States v. Piren, No. ARMY 20110416, slip op. at 1 (A. Ct. Crim. App. Jan. 7, 2014).

Military Rule of Evidence (M.R.E.) 611(b) provides that "[c]ross-examination should be limited to the subject matter of the direct examination and matters affecting the credibility of

the witness." We granted review to determine whether the military judge abused her discretion when she overruled a defense objection that the government's cross-examination of Piren exceeded the scope of direct examination. We also granted review to determine whether the military judge abused her discretion when she denied a defense motion to suppress the results of a DNA analysis.[1] We hold that the military judge did not abuse her discretion in either instance and therefore affirm the ACCA.

## Background

While attending a Volkfest in Nuremberg, Germany, Piren befriended SPC KW and her friends at a bar. Later that evening, KW and her friends found Piren passed out in the street due to his intoxication. They carried Piren back to KW's hotel room and placed him on the floor of the room. KW, who was also intoxicated, decided that she would go to sleep in her bed. KW's friends then left the hotel room with Piren passed out on the floor and KW sleeping in the bed.

---

[1] We granted review of the following issues:

> I.  Whether the military judge abused her discretion by overruling the defense counsel's scope objection during the government's cross-examination of Appellant; and

> II. Whether the military judge erred by denying the motion to suppress results of the DNA analysis.

United States v. Piren, 73 M.J. 355 (C.A.A.F. 2014) (order granting review).

At this point, Piren's and KW's versions of the events diverge.  KW testified that she woke up in the hotel room with Piren kissing her stomach inches away from her vagina.  She screamed, "You're not Zac," kicked him, and told him to get out of the room.[2]  Piren testified that he woke up at some point during the night and KW invited him into her bed by holding out her hand.  He asserts that the two began to kiss and that KW masturbated him for about five minutes.  Piren testified that KW then helped him remove her underwear and while he was kissing her stomach she yelled "you're not Zac."  At that point, Piren testified that he realized KW had thought he was her boyfriend and offered to explain to KW's boyfriend what happened, but KW told him to leave.

Piren testified that he then went to a nearby train station where he went to sleep on a bench.  He was later awoken by his roommate, Specialist Garthwait, who was being taken into custody by the German police.  SPC Garthwait asked Piren to accompany him to the police station.  Piren followed the German police to the station, where officers began questioning Garthwait in connection with the incident reported by KW.  Piren interrupted the questioning and told police that he had been in a hotel room with a girl, that they fooled around, and that she kicked him out.  He also stated that she thought he was her boyfriend.  Two

---

[2] Zac was the name of KW's boyfriend.

4

military police officers arrived at the police station and Piren made the same statement to them.

Piren was placed in handcuffs and the military police later took him to the Vilseck Health Clinic, where he gave his consent to a sexual assault examination. He was examined by Lieutenant Colonel Alumbaugh, a Sexual Assault Nurse Examiner. Prior to trial, Piren moved to suppress all the evidence derived from the sexual assault exam, arguing that his consent to the exam had been involuntary. If the court found that his consent was voluntary, Piren argued in the alternative that since he had not received any Article 31, UCMJ, 10 U.S.C. § 831, warnings, any statements he made to LTC Alumbaugh and all derivative evidence from the sexual assault examination should be suppressed. Following a hearing and arguments, the military judge held that Piren had voluntarily consented to the sexual assault examination. The government had agreed that any statements Piren made to LTC Alumbaugh during the examination should be suppressed, but specifically reserved the right to use the statements for impeachment purposes. The military judge also held that the results of the sexual assault examination did not derive from any inadmissible statements Piren may have made to LTC Alumbaugh.

## Discussion

I.  Did the military judge abuse her discretion in overruling defense counsel's objection that the cross-examination exceeded the scope of direct examination?

Piren argues that the military judge abused her discretion by allowing the government to exceed the scope of his direct testimony and question him as to matters that were excluded pursuant to a pretrial motion.  As noted, the government did not oppose Piren's motion to suppress the statements he made to LTC Alumbaugh, but reserved the right to use the statements for impeachment purposes.

Piren chose to testify at trial and, on direct examination, his defense counsel solicited his version of the events up to the point he left the train station with SPC Garthwait and the German police.  During cross-examination, however, trial counsel asked Piren about his statements to LTC Alumbaugh during the sexual assault examination.  The defense objected to this line of questioning as being outside the scope of direct examination since the direct examination had not chronologically proceeded beyond what occurred at the train station.  The military judge overruled the objection.  Trial counsel then asked Piren whether, during the sexual assault examination, he had told LTC Alumbaugh that:  (1) KW kissed him, (2) KW kissed his ear, (3) KW grabbed his penis, (4) that KW masturbated him for five

6

minutes.  Piren responded that he had told LTC Alumbaugh all four of the statements.

These statements were subsequently discussed by the parties during an Article 39, UCMJ, 10 U.S.C. § 839, session. Ultimately, the military judge determined that LTC Alumbaugh could be recalled to impeach Piren's testimony by contradiction. However, she limited LTC Alumbaugh's testimony to the four statements that Piren testified on cross-examination he had told LTC Alumbaugh.  During redirect, LTC Alumbaugh testified that Piren had not told her any of the four statements.  Following the presentation of evidence, the government stated that it would be arguing impeachment by contradiction in its final argument.

This Court reviews a military judge's admission of the evidence for an abuse of discretion.  United States v. Dewrell, 55 M.J. 131, 136 (C.A.A.F. 2001).  Under that analysis, findings of fact are reviewed for clear error and conclusions of law are reviewed de novo.  United States v. Gallagher, 66 M.J. 250, 253 (C.A.A.F. 2008).  The abuse of discretion standard is strict, calling for the challenged action to be "arbitrary, fanciful, clearly unreasonable, or clearly erroneous."  United States v. McElhaney, 54 M.J. 120, 130 (C.A.A.F. 2000) (citations and internal quotation marks omitted).

7

Piren asserts that his direct testimony was chronologically limited to events prior to his sexual assault evaluation and that he had not testified about his statements to LTC Alumbaugh. Piren also argues that because LTC Alumbaugh did not give him any Article 31 warnings, any statements that he made were inadmissible. Finally, he asserts that once this cross-examination was erroneously allowed, the government improperly impeached his cross-examination testimony by presenting improper rebuttal testimony.

The government responds that Piren opened the door to his statements to LTC Alumbaugh when he testified to his version of events. The government further argues that it is allowed wide leeway in the scope of cross-examination of a defendant who takes the stand, affording it a fair response to the defendant's claims and to impeach credibility.

A military judge is given broad discretion to impose reasonable limitations on cross-examination. McElhaney, 54 M.J. at 129. However, "an accused who exercises his right to testify takes his credibility with him to the stand, and it may be assailed by every proper means." United States v. Gibson, 18 C.M.R. 323, 326 (C.M.A. 1955) (citations omitted). This is reflected in M.R.E. 611(b), which allows cross-examination into "the subject matter of the direct examination and matters affecting the credibility of the witness."

United States v. Piren, No. 14-0453/AR

When the accused takes the stand, the privilege against self-incrimination is waived. M.R.E. 301(e). We have held that:

> [a]n accused is not required to testify in his defense and his failure to do so may not be the basis for any inference against him. But where he does elect to testify, as did this appellant, his credibility may be impeached like that of other witnesses. Hence, though he may not be cross-examined as to his general character, he may be so examined as to his credibility.

United States v. Tomchek, 4 M.J. 66, 71-72 (C.M.A. 1977).

Piren's arguments focus on the scope of the direct examination and do not address the language in M.R.E. 611(b), which authorizes cross-examination into "matters affecting the credibility of the witness." When Piren elected to testify, he placed his credibility at issue and the government's cross-examination as to the statements he had made to LTC Alumbaugh was designed to explore that credibility. The government could, therefore, properly test Piren's credibility on cross-examination.

When Piren subsequently testified on cross-examination as to what he had told LTC Alumbaugh during the sexual assault examination, his credibility remained at issue. This opened his testimony to impeachment by contradiction by having LTC Alumbaugh testify to the contrary. Impeachment by contradiction is a line of attack that "involves showing the tribunal the contrary of a witness' asserted fact, so as to raise an

9

inference of a general defective trustworthiness" or that the accused is capable of error. United States v. Banker, 15 M.J. 207, 210-11 (C.M.A. 1983) (citations omitted).

Although Piren's statements were unwarned, M.R.E. 304(b)(1) specifically provides for the use of unwarned statements for purposes of impeachment by contradiction.[3] Therefore, the military judge did not abuse her discretion in overruling the defense objection that the government's cross-examination exceeded the scope of direct examination and by subsequently allowing impeachment by contradiction.

II. Did the military judge err in denying the defense motion to suppress the DNA evidence?

Piren's motion to suppress the DNA evidence is based on his assertion that his consent to the sexual assault exam was not voluntary. Piren was transported to the clinic by military police in handcuffs where he met Special Agent Harris, an Army CID agent. SA Harris instructed the military police to remove Piren's handcuffs and asked for Piren's consent to submit to a sexual assault examination. Harris had started to go through the consent form when Piren asked if he should get a lawyer. SA Harris told Piren that he would be advised of his legal rights when he came to the CID office later that day. Harris continued

---

[3] Due to recent changes in the Military Rules of Evidence, the language regarding impeachment by contradiction, previously found in M.R.E. 304(b)(1), now appears in M.R.E. 304(e)(1). See Exec. Order No. 13,643, 3 C.F.R. 251 (2013) (implementing 2013 amendments to the Manual for Courts-Martial (2012 ed.)).

to read the consent form to Piren and told him where he should place his initials and signature if he consented to the exam. Piren completed the form, consenting to the sexual assault exam. SA Harris testified that after Piren had signed the consent form, he asked Piren if he was sure he wanted to do this and that it was of his (Piren's) own free will.[4]

The military judge found that: SA Harris advised Piren that the sexual assault examination was voluntary; there was no undue pressure; there was no unequivocal request for an attorney, nor is one required when consenting to a search; after the discussion with SA Harris, Piren could have stated that he would not consent to the test until after he discussed it with a lawyer; Piren thought he was going to be subjected to the sexual assault examination regardless of whether he signed or not and made a conscious choice to consent while he was at the clinic. Balancing these factors, the military judge found that Piren had made a conscious decision to submit to the test.

---

[4] Piren asserted that before he signed the form, Harris told him that either they get the test over with or he would try to obtain permission from command. Unbeknownst to Piren, another CID agent had already obtained search authorization from a military magistrate which was limited to obtaining Piren's DNA through a blood sample. The record shows the government preferred to use Piren's consent to a sexual assault examination because it would result in more than just the collection of DNA evidence, including the use of fluorescence to detect biological fluids, and a collection of hair, fibers, and biological swabs. SA Harris testified that he would have used the search authorization for the DNA if Piren refused or revoked consent to the sexual assault exam.

United States v. Piren, No. 14-0453/AR

A search may be conducted "with lawful consent."  M.R.E. 314(e)(1). "Consent is a factual determination," and a military judge's findings "will 'not be disturbed on appeal unless unsupported by the evidence or clearly erroneous.'"  United States v. Vassar, 52 M.J. 9, 12 (C.A.A.F. 1999) (citation and internal quotation marks omitted).  Courts evaluate voluntariness with regard to consent based on the totality of circumstances.  United States v. Wallace, 66 M.J. 5, 9 (C.A.A.F. 2008) (citing Schneckloth v. Bustamonte, 412 U.S. 218, 226-27 (1973)).  Where the government has prevailed on a motion to suppress, we review the evidence in the light most favorable to the Government.  United States v. Kitts, 43 M.J. 23, 28 (C.A.A.F. 1995).  Both parties rely on the six nonexclusive factors set forth in Wallace, 66 M.J. at 9 (the Wallace factors) to determine whether the consent was voluntary.[5]

(1)  The degree to which liberty was restricted:

The military police transported Piren to the clinic from the German police station in handcuffs.  He arrived at approximately 5:00 p.m. and the clinic was closed for normal business.  After Piren's handcuffs were removed, Harris provided Piren with a consent form for the sexual assault examination.  Piren did not ask if he could leave and Harris did not tell him he was free to leave.  Under this factor Piren could have

_____

[5] Wallace adopted the factors set forth in United States v. Murphy, 36 M.J. 732, 734 (A.F.C.M.R. 1992).  66 M.J. at 9.

reasonably believed that his liberty was restricted to some degree.

   (2)  The presence of coercion:

   Piren argues that the effect of spending twelve hours in handcuffs and being interviewed by an armed CID agent was impermissibly intimidating.  However, the record reflects that Harris did not use any coercive tactics.  SA Harris twice advised Piren that the sexual assault evaluation was voluntary and he did nothing to create a pressured environment.  The military judge found that while Piren thought that he was going to be subjected to the sexual assault examination regardless of whether he consented or not, Piren had made a conscious decision to consent to the exam.

   The consent form that Piren signed is also instructive as it expressly states:

> I have been requested by the undersigned USACIDC
> Special Agent to give my consent to a search of my
> person, premises, or property as indicated below. I
> have been advised of my right to refuse a search of my
> person, premises, or property.  (If you do not give
> your consent, do not sign this form.)

Emphasis in original.

   In addition, within the signature block of the consent form, there is an express statement that the form was signed "freely, voluntarily and without threats or promises of any kind."

13

    (3)  Suscept's awareness of the right to refuse based on inferences of the suspect's age, intelligence, and other factors:

Piren was eighteen years old at the time of the incident. There is nothing in the record as to whether this was Piren's first contact with law enforcement procedures, but there is no indication that Piren was of below average intelligence.

    (4)  Suspect's mental state at the time:

Piren had a blood alcohol content of .00. He may have been lacking sleep given the timeline of events, but he did not testify that he was impaired by a lack of sleep or for any other reason. There is nothing in the record which indicates that his mental state was diminished.

    (5)  Consultation, or lack thereof, with counsel:

Although access to counsel is relevant to the analysis, there is no right to have an attorney before consent is granted. United States v. Burns, 33 M.J. 316, 319-20 (C.M.A. 1991). Piren did not unequivocally request an attorney and was told that his rights would be explained to him later in the day. The military judge found that after the discussion with Harris, Piren could have stated that he did not consent to the test until he had discussed the test with a lawyer. However, the fact that his question regarding an attorney was deflected does weigh in his favor.

   (6)  The coercive effects of any prior violations of the
        suspect's rights:

LTC Alumbaugh's failure to give Piren Article 31(b) rights
before questioning him about the incident does constitute a
violation of Piren's rights.  However, as that questioning
occurred after Piren signed the consent form, it was not a
"prior" violation and could not have had any coercive effect on
his decision to consent to the search.

## Summary of the Wallace factors

While Piren may have believed that his liberty was
restricted to some degree and while he did ask whether he should
get an attorney, those factors are not sufficient in this case
to invalidate his consent.  The remaining Wallace factors
support a finding that Piren's consent was voluntary.  Once
Piren arrived at the clinic, he was told several times that his
decision to consent to the exam was voluntary and that he could
refuse.  The consent form that he reviewed and signed clearly
reiterated those rights.  Reviewing the evidence in the light
most favorable to the government, we conclude that the military
judge did not abuse her discretion in finding that Piren's
consent was voluntary.

## Decision

The military judge did not abuse her discretion when she
allowed the government to cross-examine Piren about his
statements to LTC Alumbaugh during the sexual assault

15

examination and when she found that Piren had voluntarily consented to the sexual assault evaluation.  The decision of the Army Court of Criminal Appeals is therefore affirmed.