CORRECTED COPY

# UNITED STATES ARMY COURT OF CRIMINAL APPEALS

Before the Court Sitting *En Banc*

**UNITED STATES, Appellee**
**v.**
**Sergeant ERIC F. KELLY**
**United States Army, Appellant**

ARMY 20150725

Headquarters, 21st Theater Sustainment Command
David H. Robertson, Military Judge
Major Michael P. Baileys, Acting Staff Judge Advocate (pretrial)
Colonel Paula I. Schasberger, Staff Judge Advocate (post-trial)

For Appellant:  Zachary D. Spilman, Esquire (argued); Captain Matthew L. Jalandoni, JA; Zachary D. Spilman, Esquire (on brief); Captain Katherine L. DePaul, JA; Captain Matthew D. Bernstein, JA (on reply brief).

For Appellee:  Captain Jennifer A. Donahue, JA (argued); Colonel Mark H. Sydenham, JA; Lieutenant Colonel A.G. Courie III, JA; Major Melissa Dasgupta Smith, JA; Captain Jennifer A. Donahue, JA (on brief).

5 July 2017

---------------------------------
OPINION OF THE COURT
---------------------------------

WOLFE, Judge:

After a contested trial of the facts, a court-martial with enlisted representation convicted appellant, Sergeant (SGT) Eric F. Kelly, of abusive sexual contact and sexual assault in violation of Article 120, Uniform Code of Military Justice, 10 U.S.C. § 920 (2012 & Supp. I 2014) [hereinafter UCMJ].  Appellant brings numerous claims of error to our attention, seven of which we discuss below.[1]  The

---

[1] We do not address in depth appellant's contention that the military judge's deviation from the standard instructions from Dep't of Army, Pam. 27-9, Legal Services:  Military Judges' Benchbook [hereinafter Benchbook] (10 Sep. 2014) was error.  As appellant did not object to the instructions we test for plain error.  Rule for Courts-Martial [hereinafter R.C.M.] 920(f); *United States v. Davis*, 76 M.J. 224

(continued . . .)

panel sentenced appellant to be dishonorably discharged from the Army, to be confined for one year, to forfeit all pay and allowances, and to be reduced to the grade of E-1.

In December 2014, SGT RK had just returned from a deployment in Afghanistan where she had served as a crew member of a rotary wing medical evacuation unit. Appellant and SGT RK previously served together. Appellant invited SGT RK over to his house where, along with appellant's wife and other friends, they played board games and drank alcohol. Both appellant and SGT RK testified but gave starkly different versions of what happened next.

Sergeant RK testified that after falling asleep on appellant's couch, she awoke to appellant touching her breast. After pushing his hand away and telling him to stop, she went to the guest bedroom and fell back asleep. Sergeant RK again woke up to appellant touching her, this time as he was removing her pants. She then testified appellant had sex with her as she tried to resist. She reported the assault to a mutual friend the next day.

Appellant, by contrast, testified the sexual encounter was entirely consensual. Appellant claimed he and SGT RK had a deeply personal conversation about her difficult experiences in Afghanistan, which included airlifting dead children. He said the conversation turned sexual when SGT RK kissed him. He conceded touching SGT RK's breast but stated it was only upon her invitation after he tried to guess her breast size. Appellant also agreed he tried to have sexual intercourse with SGT RK, but could not recall whether there had been actual penetration.

*I. The Numbers Game*

During voir dire, the senior member of the panel, Colonel (COL) F, stated he did not believe a person who was black-out drunk was capable of consenting.

_____

(. . . continued)
(C.A.A.F. 2017). Having reviewed the instructions, we do not find error let alone plain and obvious error.

While the instructions were non-standard, they were not wrong. For example, when the sexual assault by bodily harm is the penetrative act itself, the Benchbook provides as a third element to the offense: that the victim did not "consent" to the touching. See Benchbook, para. 3-45-14(c) n.2. The military judge in this case did not instruct on that element. However, he included identical language into the definition of bodily harm instructing that "in order to find the sexual act was offensive and nonconsensual, you must be convinced beyond a reasonable doubt that Sergeant [RK] did not consent to having her vulva penetrated by the accused's penis."

Appellant challenged the member, but the military judge denied the challenge. Appellant then waived any appellate issue by not exercising a peremptory[2] challenge. R.C.M. 912(f)(4).

Appellant now asserts defense counsel was ineffective in failing to exercise a peremptory[3] challenge. To succeed, appellant must demonstrate that not using a peremptory[4] challenge was deficient, *and* that the military judge erred in denying the defense challenge for cause (i.e. prejudice).[5] Nonetheless, we will address appellant's claim that his counsel's performance was deficient.

In determining whether appellant's counsel at trial was ineffective we apply the well-settled two prong test in *Strickland v. Washington*, 466 U.S. 668, 697 (1984).

Appellant claims his counsel was deficient for admittedly engaging in the "numbers game." The "numbers game" is when a party tactically exercises a peremptory[6] challenge to obtain a favorable number of members. As a guilty verdict requires the concurrence of two-thirds of members, under the "numbers game" the government prefers to have panels composed of multiples of three (e.g. 6, 9, or 12, panel members). R.C.M. 902(c)(2)(B).

---

[2] Corrected.

[3] Corrected.

[4] Corrected.

[5] If the military judge did not abuse his discretion in denying the challenge for cause to COL F, then even if the defense counsel were deficient in not exercising a peremptory* challenge, appellant cannot show prejudice from a qualified member continuing to serve on the court-martial. Appellant's burden to establish the claim of ineffective assistance of trial is more critical in cases (such as this one) where the allegation involves affidavits from outside the record of trial which are not part of our normal Article 66(c), UCMJ, review. As we resolve this issue on the deficiency prong, we do not address one way or the other whether the military judge erred in denying appellant's challenge for cause.

* Corrected

[6] Corrected.

3

In this case, when it came time for the defense to exercise a peremptory[7] challenge, there were seven members on the panel. Under the "numbers game," the defense counsel's choice was to leave the panel at seven members or exercise a peremptory[8] challenge and reduce the panel to six members.

By not exercising a peremptory[9] challenge, the panel of seven required the concurrence of at least five members to convict appellant. If the defense exercised a peremptory[10] challenge, a guilty verdict would require the concurrence of only four members. The exercise of a peremptory[11] challenge would have removed a vote that, all other things being equal, the government would have needed to prove guilt.

Assume, as appellant contends, that COL F was a government-friendly panel member. With a seven member panel, the government would need to convince COL F and at least four other members of appellant's guilt. With COL F removed, the government would still need to convince at least four members. As a matter of math, the defense counsel's reasoning for not exercising a peremptory[12] challenge was sound.

Of course, panel member selection is *not* merely a question of math. Many litigators often pay little attention to the "numbers game" and focus instead on shaping the panel based the panel members' answers to questions in voir dire. Thus, one can say as a matter of logic that COL F's vote would have been irrelevant, as the government would have been required to have four votes for guilty whether COL F remained on the panel or not. But, one cannot say COL F's presence on the panel was of no consequence. Panel members deliberate. The danger of an unfavorable panel member is not merely they vote against your client, it is also they may persuade *other* panel members how to vote. Perhaps the danger is all the more so when the member in question will become the panel president.

This scenario is likely why in *United States v. Newson*, our superior court stated they "do not subscribe to the myth of the 'numbers game.'" 29 M.J. 17, 21 (C.A.A.F. 1989). However, the context in that case is important. In *Newson*,

---

[7] Corrected.

[8] Corrected.

[9] Corrected.

[10] Corrected.

[11] Corrected.

[12] Corrected.

appellant claimed he had been deprived of the opportunity to play the "numbers game" because the military judge altered the order of challenges. The court found no prejudice, stating there "is no reason to suspect that a different mix of members would have produced results more favorable to appellant." *Id.* Indeed that same court stated "[t]here is no question that in the court-martial system the numerical composition of the court may be said to be either 'favorable' or 'unfavorable' to either side." *Id.* at 19 n.1.

This case is not *Newson.* Is there a sound logic behind the "numbers game"? There is. The Court of Appeals for the Armed Forces (CAAF) has explicitly said that certain numbers are "favorable" to one side or the other. *Id.* In the same footnote in *Newson* quoted above the court described the numbers game as a matter of "trial tactics and strategy." *Id.* Accordingly, the performance of the defense counsel at trial was not constitutionally deficient. That, however, should not be read as a ringing endorsement of the practice. There is an obvious danger in substituting math for advocacy.[13]

## *II. Improper Argument*

Appellant alleges the court-martial committed plain error when the military judge failed to sua sponte correct the trial counsel's findings argument. Specifically, we address appellant's claim that the trial counsel told the panel appellant lied to them during his testimony.

Part of the government's strategy at trial was to admit appellant's statements regarding the night of the assault. The government wanted the panel to question appellant's reliability and veracity because of his changing statements. The trial counsel analogized that appellant had been caught in his own "web of lies." We decline to provide appellant relief because: 1) we find appellant waived any objection to this argument; and 2) if not waived, the argument did not amount to plain error.

## *A. Waiver*

The Rules for Courts-Martial use the term "waiver" in two different contexts. On some occasions, a rule will state that an objection is "waived, absent plain error." *See*, *e.g.,* R.C.M. 920. In other cases the rule will say the objection is "waived" without any condition for plain error.

---

[13] As a coda to this analysis we note the "numbers game" will come to an end with the recent amendments to the UCMJ establishing fixed panel sizes. National Defense Authorization Act for Fiscal Year 2017, Pub. L. 114-328, § 5187 (2016) (Assembly and Impaneling of Members and Related Matters).

R.C.M. 919(c) governs argument on findings. The rule states: "[f]ailure to object to improper argument before the military judge begins to instruct the members on findings shall constitute waiver of the objection." R.C.M. 919(c). The rule has no "plain error" condition.

In the recent case of *United States v. Ahern*, 76 M.J. 194 (C.A.A.F. 2017), our superior court discussed this difference while interpreting Military Rule of Evidence [hereinafter Mil. R. Evid.] 304. The waiver provision of Mil. R. Evid. 304 is virtually identical to the rule at issue here, R.C.M. 919(c). Our superior court wrote the rule "unambiguously provides that any claim arising under [the rule] is waived absent an objection." *Id*. at 197. The CAAF noted the difference between the two types of waiver and stated "[t]his is not a case where the rule uses the word 'waiver' but actually means 'forfeiture.'" *Id*. The court in *Ahern* found this court erred when we tested for forfeiture and plain error. *Id*. at 198.

To avoid making the same error here, and applying *Ahern* to this case, we find appellant waived any objection to the trial counsel's argument. As a matter of statutory interpretation, R.C.M. 919 "unambiguously" provides "failure to object . . . *shall* constitute waiver of the objection" (emphasis added).[14] R.C.M. 919(c).

We duly recognize in numerous prior cases, both this court and our superior court have tested improper arguments for forfeiture and plain error.[15] *See, e.g., United States v. Fletcher*, 62 M.J. 87, 88 (C.A.A.F. 2005). However, the plain language of the rule, and our superior court's decision in *Ahern*, compel our result here. To find otherwise would mean the same "unambiguous" words have polar opposite meaning within the same regulatory structure. It would also demand we give no meaning to the stark differences between R.C.M. 919(c) and 920(f), which were promulgated simultaneously. Such a finding would be contrary to the plain language of the rule and contrary to the CAAF's decision in *Ahern*. To the extent we are presented with contrary case law, we follow our superior court's most recent decision.

---

[14] The obvious effect of *Ahern* is to encourage timely objections at trial. Timely objections allow the military judge to issue corrective instructions (or declare a mistrial if the error is too egregious to be corrected) and prevent additional erroneous argument. In general, a rule properly promulgated by the President is binding on this court unless it violates an applicable statute such as the UCMJ or the Constitution. Thus, we discuss here only circumstances where application of the rule is not of a constitutional magnitude (e.g. commenting on the accused's right to silence).

[15] This court may "notice" waived error. *See United States v. Chin*, 75 M.J. 220 (C.A.A.F. 2016); UCMJ, art. 66(c). Thus, if application of waiver results in an unbalance, equilibrium may be restored by a Court of Criminal Appeals (CCA).

*B. Plain Error*

*Ahern* was decided after we held oral argument in this case, so the parties did not have the opportunity to address its impact. Accordingly, we will also address the error as it was assigned. We do not find the trial counsel's argument amounted to plain error. Plain error occurs when: 1) there is error; 2) the error is plain or obvious; and 3) the error results in material prejudice to a substantial right of the accused. *United States v. Rodriguez*, 60 M.J. 87, 88-89 (C.A.A.F. 2004).

Our superior court stated "[c]alling the accused a liar is a dangerous practice that should be avoided." *Fletcher*, 62 M.J. at 182. The court stopped short, however, of stating that such comments are per se error. The question is then, when is it error for a party (especially the trial counsel) to label the testimony of a witness a "lie"? And, when may that witness be called a "liar"?

Our superior court has described the difference between permissible and impermissible arguments as an "exceedingly fine line which distinguishes permissible advocacy from improper excess." *Id*. at 183. On which side of that line one falls will depend on whether the counsel is arguing a permissible inference from the evidence or engaging in "name-calling." *United States v. White*, 486 F.2d. 204, 207 (2d Cir. 1973).

When an accused testifies, the veracity of the testimony is at issue. The trial counsel may properly point out the incredulous nature of the testimony and point out contradictions with other evidence. Counsel may also call witnesses to testify that in their opinion the accused is not a truthful person. If a person can be shown to have lied on one or more occasion, it is also permissible to argue the panel should not believe the testimony in other regards. Indeed, trials often turn on such credibility determinations.

The CAAF's decision in *Fletcher* cited *White* heavily. In *White*, the Second Circuit remonstrated the prosecutor for calling the defendant a liar. 486 F.2d. at 204-05. In a subsequent case, however, that same court noted "because defendant had put his credibility in issue, the prosecutor's arguments portraying him as a liar were not improper." *United States v. Edwards*, 342 F.3d 168, 181 (2d Cir. 2003); *see also United States v. Coriaty*, 300 F.3d 244, 255-56 (2d Cir. 2002) (observing it is generally not improper for the prosecutor to use the words "liar" and "lie" to characterize disputed testimony when the witness's credibility is clearly in issue) (internal citations omitted).

Likewise, the D.C. Circuit has stated they could "conceive of no reason in law why the words 'lie' and 'lying' should be banned from the vocabulary of summation, particularly in cases that turn on the defendant's credibility." *United States v. Donato*, 99 F.3d 426, 432 (D.C. Cir. 1996) (citing *United States v. Dean*, 55 F.3d

7

640, 665 (D.C. Cir. 1995), *cert. denied*, 516 U.S. 1184 (1996)) (internal quotations omitted); *see also Virgin Islands v. Edwards*, 233 F. App'x 167, 173 (3rd Cir. 2007).

Summarizing federal case law, the Fourth Circuit Court of Appeals said the following:

> We have not determined whether describing a defendant as a "liar" is, per se, improper. But the Second, Seventh, Eighth, and Ninth Circuits have held that the government may refer to a defendant as a liar under some circumstances. *E.g.*, *United States v. Moreland*, 622 F.3d 1147, 1161-62 (9th Cir. 2010) (allowing where based on reasonable inferences from the evidence); [*Coriaty*, 300 F.3d 244, 255 (2nd Cir. 2002)] (permitting as long as not excessive or inflammatory); *United States v. Shoff*, 151 F.3d 889, 893 (8th Cir. 1998) (finding no misconduct as long as the prosecutor is arguing about the evidence); *United States v. Manos*, 848 F.2d 1427, 1437 (7th Cir. 1988) (deducing no undue prejudice from labeling "the teller of [a] falsity a liar").

*United States v. Powell*, 680 F.3d 350, 358 (4th Cir. 2012).

On the other hand, the First Circuit stated the impropriety of a prosecutor calling the defendant a "liar" and a "crook" is "so clear as not to brook serious discussion." *United States v. Rodriguez-Estrada*, 877 F.2d 153, 158 (1st Cir. 1989); *United States v. Moore*, 11 F.3d 475, 481 (4th Cir. 1993) ("We have recognized that it is highly improper for the government to refer to a defense witness as a liar."). Perhaps the difference lies between arguing that testimony was intentionally false (a lie) and calling the witness a liar (name-calling).

Answering this question likely applies not only to the testimony of the accused. When an accused takes the stand, he or she is subject to same credibility determinations as other witnesses. The United States Supreme Court has stated that "[o]nce a defendant takes the stand, he is subject to cross-examination impeaching his credibility just like any other witness." *Portuondo v. Agard*, 529 U.S. 61, 70 (2000) (internal quotations and citations omitted); *see also United States v. Piren*, 74 M.J. 24 (C.A.A.F. 2015). A prohibition on the trial counsel calling the accused's testimony a lie may, therefore, be equally applicable to the testimony of his accuser.

However, we need not decide definitively in this case which side of the line the trial counsel's argument fell.[16] This is a case of unpreserved error. Assuming the trial counsel's argument was error, it was not plain and obvious error for two reasons.

First, error is "plain" when it is "obvious" or "clear under current law." *United States v. Olano*, 507 U.S. 725, 734 (1993). As the prior discussion shows, the trial counsel's arguments were not clearly error under current law.

Second, we look to see how obvious the error was in the context of the trial. When examining this prong, we ask whether the error was so obvious "in the context of the entire trial" that "the military judge should be 'faulted for taking no action' even without an objection." *United States v. Gomez*, 76 M.J. 76, 81 (C.A.A.F. 2017) (citing *United States v. Burton*, 67 M.J. 150, 153 (C.A.A.F. 2009) (quoting *United States v. Maynard*, 66 M.J. 242, 245 (C.A.A.F. 2008))); *see also United States v. Frady*, 456 U.S. 152, 163 (1982) (noting that error is clear if "the trial judge and prosecutor [would be] derelict in countenancing it, even absent the defendant's timely assistance in detecting it"). The trial counsel's arguments were not so wrong that we could fault the military judge for not sua sponte intervening.

We cannot say appellant meets either definition of plain and obvious error. Therefore, we do not find appellant has met his burden of establishing plain error. The argument in this case is not nearly as severe as that which was made in *Fletcher*.

We therefore answer this question identically to our superior court in *United States v. Jenkins*:

> Applying the foregoing principles to trial counsel's argument in this case, we hold that there was no plain error. Although trial counsel repeated called appellant a thief and a liar, defense counsel did not find the argument sufficiently offensive to warrant an objection or a request for a curative instruction.

54 M.J. 12, 20 (C.A.A.F. 2000)

---

[16] Consider the following possible arguments ranging from the permissible to the clearly impermissible: "The evidence shows the accused deliberately tried to deceive when he testified that . . . ;" "The evidence shows the accused lied when he testified that . . . ;" "The accused lied when he testified that . . . ;" "The evidence shows the accused is a liar;" "The accused is a liar;" "I think the accused is a liar who lied to you when . . . ;" and "Trust me, I've been working on this case for months, the accused is a liar."

Accordingly, we leave this issue where we started, with our superior court's guidance that "[c]alling the accused a liar is a dangerous practice that *should* be avoided." *Fletcher*, 62 M.J. at 182 (emphasis added).

### *III. The Rules of Completeness*

At trial, the prosecution called U.S. Army Criminal Investigation Command (CID) Special Agent (SA) AG to testify about statements appellant made during an interrogation. On cross-examination, the defense attempted to elicit other statements made by appellant during the same interrogation. What followed was a tripartite misunderstanding of the interplay between the *two* "rules of completeness" in the Military Rules of Evidence.

After the trial counsel finished the direct examination, the defense counsel asked SA AG about other statements appellant made during the interrogation. After the military judge sustained the trial counsel's hearsay objection, the defense counsel said the following:

> [A]t this time, we would request that under the "rule of completeness" that - - as portions of the accused's statement have been offered by the prosecution, that the entire statement - - being that the - - made by the accused be permitted to be questioned by the defense pursuant to Rule 806.

The military judge directed an Article 39(a), UCMJ, session to consider appellant's objection. The defense counsel explained:

> The defense believes that the government opened the door to this line of questioning and to permit the defense to offer the rest of the statement offered - - that the accused gave under the "rule of completeness" as this was not testimony that was only offered to prove - - to demonstrate an inconsistent statement. . . . And as the - - one of the charged offenses, events that happened in the bedroom, we believe that, at the very least, a mistake to fact as to consent has been raised. And therefore, we should be able to discuss the rest of the statement with the individual that he - - who received that statement.

The military judge found this explanation confusing and asked the defense, "So what specifically do you want to ask this witness, and what rule allows its admissibility?"

10

The defense counsel responded the remainder of the accused's statement was admissible as the "rule of completeness" under Mil. R. Evid. 806. The military judge then questioned whether counsel was citing the correct rule. The defense apologized, admitted he was citing the wrong rule, and that he was looking for the correct rule.

The military judge asked if the defense had intended to cite Mil. R. Evid. 106. The defense counsel agreed, and told the judge "Yes. That's exactly the rule we were thinking of."

It was not the right rule.

"Under the Military Rules of Evidence . . . there are two distinct rules of completeness." *United States v. Rodriguez*, 56 M.J. 336, 339 (C.A.A.F. 2002). They are Mil. R. Evid. 106 and 304(h)(2). Our superior court in *Rodriguez* explained the difference between the two. *Id.* In short, Mil. R. Evid. 106 applies to written or recorded statements made by any person, and Mil. R. Evid. 304(h)(2) applies to statements made by the accused whether in writing, recorded, or oral.

As Mil. R. Evid. 106 does not apply to oral statements, the military judge correctly determined that Mil. R. Evid. 106 was inapplicable to appellant's oral statement to SA AG. No one discussed the rule that was the most likely applicable, Mil. R. Evid. 304(h)(2). The CAAF explained the effect of Mil. R. Evid. 304(h)(2) as follows:

> Rule 304(h)(2): (1) applies to oral as well as written statements; (2) governs the timing under which applicable evidence may be introduced by the defense; (3) permits the defense to introduce the remainder of a statement to the extent that the remaining matter is part of the confession or admission or otherwise is explanatory of or in any way relevant to the confession or admission, even if such remaining portions would otherwise constitute inadmissible hearsay; and (4) requires a case-by-case determination as to whether a series of statements should be treated as part of the original confession or admission or as a separate transaction or course of action for purposes of the rule.

*Rodriguez*, 56 M.J.. at 341-42. As the correct rule was not discussed, we are faced with an undeveloped record on appeal. There are two rules of completeness. As the defense counsel told the military judge that Mil. R. Evid. 106 was "exactly" the rule he was referring to, the correct rule was never identified. The military judge's ruling on Mil. R. Evid. 106 was correct. The better rule, Mil. R. Evid. 304(h)(2),

was never mentioned.  Accordingly, the "case-by-case" determination on whether the statements were part of the same statement never happened.

Nonetheless, we need not dwell on whether any error was preserved (unclear) or whether we would under Article 66(c), UCMJ, notice the error if forfeited (we likely would, given these facts), as appellant was clearly not prejudiced by any error.  The defense counsel sought to admit, through SA AG, appellant's version of events about the alleged sexual assault.  Appellant took the stand and testified to exactly this same information.  Accordingly, we cannot find prejudice.

*IV. Improper Panel Questions*

During trial, the panel asked a series of questions regarding past adulterous acts by appellant.  Appellant asserts on appeal the member's repeated questions demonstrate they were unable to follow the military judge's instructions to ignore this information.  Therefore, appellant argues, the military judge should have granted appellant's request for a mistrial.

The sequence of events is important and requires some explanation.  The defense at trial was any sexual contact between appellant and SGT RK was consensual.  To buttress this theory, defense counsel elicited that appellant told his wife he had consensual intercourse with SGT RK shortly after it happened.

Appellant's wife testified she was a light sleeper and did not hear any evidence of an assault.  After appellant's wife finished testifying, a panel member asked whether appellant had ever cheated on her before.  The military judge sustained the defense objection.

Appellant then testified.  The same panel member asked appellant if he had ever been unfaithful to his wife.  Again, the military judge sustained the defense objection.

Near the conclusion of appellant's testimony, a third question was asked regarding appellant's infidelity.  This time, the defense made the tactical decision to answer the question and did not object.  Appellant testified that on one prior occasion, he had an affair.  He further explained during this instance he also informed his wife of the transgression.  He also testified the affair had not resulted in any allegation of sexual assault or sexual misconduct.  Appellant's testimony successfully framed his prior affair as being consistent with his version of what happened during the alleged assault.  That is, he had cheated on his wife when he engaged in consensual conduct with SGT RK, just as he had before.

The military judge ultimately instructed the members to disregard any evidence of prior marital infidelity by appellant. Notwithstanding that instruction, the panel interrupted deliberations to ask one more question:  "When did SGT Kelly

tell his wife about his first adulterous event?" The military judge again instructed the members to ignore issues of adultery. Appellant did not object to the military judge's instructions or request additional instructions. However, *after* the panel members returned a guilty verdict appellant moved for a mistrial.

A mistrial is appropriate when "manifestly necessary in the interest of justice because of circumstances arising during the proceedings which cast substantial doubt upon the fairness of the proceedings." R.C.M. 915(a). We do not find the military judge abused his discretion in denying appellant's request for a mistrial.

Panel members normally have no formal training in the law. In general, and in this case, panel members are not offered a chance to explain *why* they ask the questions they do. Also, the military judge does not explain the legal basis as to why an objection to a question is sustained. Indeed, when a question is improper such an explanation would often compound the problem the question presents.

In this case, the defense presented the panel with testimony from appellant and his wife there had been no sexual assault and instead there was a consensual event where appellant cheated on his wife. The panel was required to judge the credibility of the testimony in light of the other evidence. Questions about appellant's marriage and relationship with his wife were probative of appellant's wife's bias and motive in testifying. The final panel question regarding "when" he told his wife of the first affair would help explain the similarity of the two events.[17] In other words, from the perspective of a panel member, adultery was relevant.

To find prejudice to appellant, we would need to find the panel wanted to know of prior adulterous acts because they believed someone who would commit adultery was more likely to commit sexual assault. We discount this rational for two reasons. First, appellant's defense was he did indeed commit (consensual) adultery. That is, appellant's very defense depended on the panel not making such far-fetched assumptions. Second, the panel's final question—about *when* appellant told his wife about the prior affair—demonstrates they were focused on the credibility of appellant's story, not whether appellant was a bad person.

Considering the entire record, the fact that the defense placed the issue of adultery squarely before the panel when appellant testified about his prior affair, considering appellant did not request or ask for any additional instructions to the members, and given the high threshold to require a mistrial, we do not find the military judge abused his discretion in denying the defense request for a mistrial.

---

[17] We speak only of logical relevance under Mil. R. Evid. 402, not legal relevance under Mil. R. Evid. 403. We do not dispute the military judge's ruling to keep issues of adultery out of the court-martial on Mil. R. Evid. 403, Mil. R. Evid. 404, or other grounds.

13

*V. Prior Inconsistent Statements, Extrinsic Evidence, and Hearsay*

The defense called Specialist (SPC) EU in their case in chief. Specialist EU was a mutual friend of both SGT RK and appellant. The morning after the charged offenses, SPC EU gave SGT RK a ride. It was at this time that SGT RK told SPC EU what happened the night before. The defense asked SPC EU to repeat a few of SGT RK's statements. The government then asked SPC EU to repeat *other* statements SGT RK made that morning.

*A. The Direct Examination*

The defense asked whether SGT RK said she was awake or asleep during "the events that occurred on the couch." Specialist EU testified SGT RK said she was awake. The defense also asked the witness to repeat whether SGT RK said what appellant's wife had told SGT RK that morning. Specialist EU said SGT RK told him appellant's wife was upset and had asked SGT RK to leave.

Both statements were inconsistent with SGT RK's testimony at trial. However, offered through SPC EU, they were *extrinsic* evidence of a prior inconsistent statement.

> Extrinsic evidence of a prior inconsistent statement by a witness is not admissible unless the witness is afforded an opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate the witness thereon, or the interests of justice otherwise require. This provision does not apply to admissions of a party-opponent as defined in Mil. R. Evid. 801(d)(2).

Mil. R. Evid. 613.

When SGT RK was on the stand, the defense never asked SGT RK whether she made the allegedly inconsistent statements. If a witness admits making a prior inconsistent statement, extrinsic evidence of the statement is prohibited. *See United States v. Gibson*, 39 M.J. 319 (C.A.A.F. 1994); *United States v. Harcrow*, 65 M.J. 190 (C.A.A.F. 2007). Again, however, no objection was made to the testimony.

*B. The Cross Examination*

The trial counsel began the cross-examination of SPC EU by laying a foundation for the "excited utterance" hearsay exception. The direct examination already established SPC EU and SGT RK talked about the alleged assault while driving away from appellant's house. Specialist EU stated SGT RK became emotional and was crying. He then agreed that she was crying "a lot."

The trial counsel then sought to ask SPC EU about the remainder of the conversation. Specifically, the government asked SPC EU if SGT RK told him she

had been raped. The defense objected on two grounds—the testimony was hearsay and was beyond the scope of the direct examination.

The trial counsel explained to the military judge the defense "asked about the conversation . . . . We are simply asking for clarification in the context of the conversation."

The military judge overruled appellant's objection but without explanation. Neither party further developed the record. Specialist EU then testified that the morning after the alleged assault, SGT RK told him appellant raped her.

### C. Analysis

On appeal, appellant claims the statements admitted by the government were inadmissible hearsay. We find the military judge did not err in admitting the statements because either they were an excited utterance[18] or because the defense opened the door to putting the conversation in context.

At issue is whether the trial counsel may properly admit statements made by SGT RK to SPC EU in order to more fully explain the context of the conversation. The defense improperly introduced extrinsic evidence of prior inconsistent statements that, as they were narrow questions, failed to provide context to SGT RK's conversation with SPC EU. The government then sought to introduce the context of the conversation.

We have recognized at least four instances in which prior statements of a witness are relevant to rehabilitate the witness's credibility. They are:

> (1) to place a purported inconsistent statement in context to show that it was not really inconsistent with a witness' trial testimony; (2) to support the denial of making an inconsistent statement; (3) to refute the suggestion that the witness' memory is flawed due to the passage of time; and (4) to refute an allegation of recent fabrication, improper influence, or motive.

*United States v. Adams*, 63 M.J. 691, 696-97 (Army Ct. Crim. App. 2006) (internal citations omitted).

---

[18] Counsel on appeal do not address the excited utterance issue. The first questions the trial counsel asked SPC EU were about SGT RK's emotional state. She was "emotional" and crying "a lot" and just left the scene of the assault for the first time. Only after laying the foundation did the trial counsel begin eliciting hearsay.

15

Here, the defense tried to portray the conversation between SPC EU and SGT RK, made shortly after the alleged assault, as starkly inconsistent with SGT RK's trial testimony. This was not a fair description. Sergeant RK had tearfully told SPC EU she had been groped on the couch, "raped" in the bedroom, and she awoke with no pants on.

The trial counsel explained to the military judge the statements elicited by the defense needed "context" to be understood. Neither party ever asked for a limiting instruction.

As our superior court stated in *United States v. Martin*,

> The invited error doctrine prevents a party from creating error and then taking advantage of a situation of his own making on appeal. As a result, invited error does not provide a basis for relief. The question of whether trial defense counsel invited an error at trial is a question of law, which we review de novo.

75 M.J. 321, 325 (C.A.A.F. 2016) (internal citations and quotations omitted).

In *United States v. Jumping Eagle*, the Eighth Circuit addressed an issue almost the same as here: "[I]t is fundamental that where a defendant 'opens the door' or 'invites error,' there can be no reversible error." 515 F.3d 794, 801 (8th Cir. 2008) (internal citation omitted). "Accordingly, we have allowed the use of otherwise inadmissible evidence, including hearsay statements, to clarify, rebut, or complete an issue opened up by defense counsel on cross-examination." *Id*. The court summarized the issue as follows:

> Jumping Eagle first brought up this conversation during Mandy's cross-examination, when he queried: "[J.J.] told you that this had happened over 20 times to him, didn't he?" During redirect of Mandy, the government asked her what J.J. had told her about the abuse. Jumping Eagle's inquiry of Mandy, opened the door, permitting further evidence of the conversation between Mandy and J.J. As a result, the district court did not commit reversible error by admitting the testimony.

*Id*. Accordingly, even if not an excited utterance, we cannot find the military judge erred in overruling the defense objection. "Otherwise, preventing the Government from walking through the door already opened by the defense would have left the members with a skewed view of the evidence." *Martin*, 75 M.J. at 327; *See United States v. Banks*, 36 M.J. 150, 162 (C.M.A. 1992) (noting that evidence "may be admitted in rebuttal when a party 'opens the door' by introducing potentially misleading testimony.") (citation omitted); *see also United States v. Segines*, 17 F.3d 847, 856 (6th Cir. 1994) (allowing evidence on the same issue "to rebut any false

16

impression that might have resulted from the earlier admission") (citation and internal quotation marks omitted).

Judge Cox addressed this same issue through a different lens in *United States v. McCaskey*:

> In my view, this is not a hearsay issue at all. The proper basis for admission of the statements is that they were relevant evidence -- made so by the defense -- and it was necessary and proper for the factfinder to know their content in order to understand the witness' explanation of the changes. The defense cannot be heard to complain that it has a right to present an abbreviated or distorted picture of the facts to the court.

30 M.J. 188, 194 (C.M.A. 1990) (Cox, J., concurring)

As we find no error, we do not answer the question of whether SPC EU's testimony would have been otherwise admissible as a prior consistent statement, or whether the admission of the statement was harmless in the context of a trial in which SGT RK's several reports of being sexually assaulted were also admitted through other witnesses.[19]

## VI. Factual Sufficiency

Appellant testified at this trial. If believed, appellant's version of events would result in a finding of not guilty. Consistent with our Article 66(c), UCMJ, responsibilities we conducted a factual sufficiency review.

Article 66(c), UCMJ, provides that this court may "weigh the evidence, judge the credibility of witnesses, and determine controverted questions of fact." When exercising this authority, this court does not give deference to the decisions of the trial court (such as a finding of guilty). *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002) (A court of criminal appeals gives "no deference to the decision of the trial court" except for the "admonition . . . to take into account the fact that the trial court saw and heard the witnesses.").

---

[19] During cross-examination of SGT RK, the defense counsel inferred she was inflating her testimony at trial by pointing out that many of the facts had not been included in her statement to CID. The thrust of the cross-examination was that she elaborated (i.e. "recently fabricated") her story since being interviewed by CID. *See* Mil. R. Evid. 801(d)(1). Her statement to SPC EU was consistent with her trial testimony and predated the statement to CID, although it also lacked the specificity of her trial testimony.

17

We note the degree to which we "recognize" or give deference to the trial court's ability to see and hear the witnesses will often depend on the degree to which the credibility of the witness is at issue. *United States v. Davis*, 75 M.J. 537, 546 (Army Ct. Crim. App. 2015), *aff'd on other grounds*, 76 M.J. 224 (C.A.A.F. 2017).

Given this deference, we credit SGT RK's version of events. *See also United States v. Crews*, ARMY 20130766, 2016 CCA LEXIS 127, at *11-12 (Army Ct. Crim. App. 29 Feb. 2016) (mem. op.) ("The deference given to the trial court's ability to see and hear the witnesses and evidence—or 'recogni[tion]' as phrased in Article 66, UCMJ—reflects an appreciation that much is lost when the testimony of live witnesses is converted into the plain text of a trial transcript."). The evidence here is factually sufficient to support the verdict.

### VII. Can the Military Judge Require an Accused to Testify to Raise a Mistake of Fact Defense?

We briefly discuss an issue raised by appellant in his R.C.M. 1105 submission to the convening authority. Appellant claimed that the night prior to the alleged assault, SGT RK kissed appellant. The defense filed a motion under Mil. R. Evid. 412 to admit the kiss as evidence of a reasonable mistake of fact as to consent.

> [W]hether evidence is constitutionally required — so as to meet the [Mil. R. Evid.] 412(b)(1)(C) exception to [Mil. R. Evid.] 412's general prohibition of sexual behavior or predisposition evidence — demands the ordinary contextual inquiry and balancing of countervailing interests, e.g., probative value and the right to expose a witness's motivation in testifying versus the danger of harassment, prejudice, confusion of the issues, the witness' safety, or evidence that is repetitive or only marginally relevant. This balance is bounded on the one hand by the broad discretion of trial judges and rulemakers' broad latitude under the Constitution to establish rules excluding evidence from criminal trials, and on the other by the Constitution's guarantee of a meaningful opportunity to present a complete defense.

*United States v. Gaddis*, 70 M.J. 248, 252 (C.A.A.F. 2011) (internal citations and quotations omitted).

Here, the defense wanted to ask SGT RK about the kiss on cross-examination. Sergeant RK, however in a closed Article 39(a), UCMJ, session pursuant to Mil. R. Evid. 412, denied the kiss happened. The military judge excluded evidence regarding the kiss unless appellant testified.

An accused is not required to testify to establish a mistake of fact defense. *United States v. Jones*, 49 M.J. 85, 91 (C.A.A.F. 1999). However, to warrant an instruction on the mistake of fact defense there must be "some evidence of an honest and reasonable mistake to which the members could have attached credit if they had so desired." *United States v. Hibbard*, 58 M.J. 71, 75 (C.A.A.F. 2003).

In other words, there is no per se requirement an accused testify to establish a mistake of fact defense, but evidence the accused honestly and reasonably believed the victim had consented must come from somewhere. In many cases, the only source of admissible evidence about the accused's subjective belief the victim consented may well be from the accused himself.

Here, only appellant and SGT RK could testify about the kiss—and SGT RK flatly denied it. Therefore, SGT RK's testimony would result in no evidence of a kiss, let alone the accused was honestly or reasonably mistaken about SGT RK's consent because of a kiss. Having SGT RK testify there was no kiss would not be some evidence of a kiss. *See id*. As SGT RK's denial of a kiss would not be any evidence, let alone "some evidence" of a defense, it was not constitutionally required under Mil. R. Evid. 412. Put differently, appellant does not have a constitutional right to admit evidence there was *no* kiss.

However, even assuming the military judge erred in restricting the cross-examination of SGT RK, we cannot find prejudice to appellant. UCMJ art. 59(a). Appellant took the stand and testified about the kiss. Accordingly, there was no prejudice when appellant was prevented from asking SGT RK about a kiss.

## VIII. Cross-examining the Accused on his Preparation for Testifying

While cross-examining appellant, trial counsel asked a series of questions designed to elicit that appellant had been well-prepared to testify. Appellant was asked several questions about having access to and reviewing the evidence in the case, as well as his ability to speak to his attorneys before testifying.

*United States v. Carpenter*, 51 M.J. 393 (C.A.A.F. 1999), addressed a similar issue on whether such questions were an inappropriate commentary on an accused's exercise of constitutional rights. *Id*. at 395-96. In *Carpenter*, the trial counsel specifically argued the accused testified with the benefit of having first seen all the government's evidence. The CAAF stated:

> This Court has not specifically ruled on the propriety of a prosecution argument that an accused has had the opportunity to shape his testimony by his presence throughout the trial and opportunity to hear all the witnesses. In *Agard v. Portuondo*, 117 F.3d 696, 709 ([2d

> Cir.] 1997), the Second Circuit held, in a split decision,
> that such an argument violates the Sixth Amendment.

*Id*. at 396. Ultimately, our superior court did not address the issue of whether such arguments are per se impermissible, as they decided that any error did not amount to plain error.

Subsequent to the CAAF's decision in *Carpenter*, however, the Supreme Court had the opportunity to consider *Agard v. Portuondo* 529 U.S. 61 (2000), and stated when an accused testifies last it is "quite impossible" for "the jury to evaluate the credibility of the defendant's testimony while blotting out from its mind the fact that before giving the testimony the defendant had been sitting there listening to the other witnesses." *Id.* at 68. The Court concluded that:

> A witness's ability to hear prior testimony and to tailor his
> account accordingly, and the threat that ability presents to
> the integrity of the trial, are no different when it is the
> defendant doing the listening. Allowing comment upon
> the fact that a defendant's presence in the courtroom
> provides him a unique opportunity to tailor his testimony
> is appropriate -- and indeed, given the inability to
> sequester the defendant, sometimes essential -- to the
> central function of the trial, which is to discover the truth.

*Id*. at 73. Given the Supreme Court's ultimate resolution of the very case that gave the CAAF pause in *Carpenter*, we see no error, let alone plain error, in the trial counsel's questions.

*IX. Mandatory Sentences and Article 66(c), UCMJ*

In his final assignment of error, appellant asks that we set aside the mandatory sentence of a dishonorable discharge as being too severe. We conclude we lack the authority to give appellant his requested relief.

Congress amended Article 56, UCMJ, in 2013 to read, in relevant part, as follows:

> While a person subject to this chapter who is found guilty
> of [sexual assault] shall be punished as a general court-
> martial may direct, such punishment must include, at a
> minimum, dismissal or dishonorable discharge, except as
> provided for in section 860 of this title (article 60) [10
> U.S.C. § 860].

The article requires that "such punishment must include" a "dishonorable discharge" in this case. The only exception to the mandatory minimum is a

reference to the convening authority's ability to reduce the sentence at initial action, in two very limited circumstances.[20] There is no exception provided for a sentence reduction as part of our Article 66(c), UCMJ, authority.[21]

Additionally, Article 66(c), UCMJ, limits our authority to give relief in a case with a mandatory punishment. "Article 66(c), UCMJ, empowers the CCAs to 'do justice,' with reference to some legal standard, but does not grant the CCAs the ability to 'grant mercy.'" *United States v. Nerad*, 69 M.J. 138, 145 (C.A.A.F. 2010). When a sentence is mandatory as a matter of law, there is no "legal standard" that would allow us to set the sentence aside.

*United States v. Curtis*, 52 M.J. 166 (C.A.A.F. 1999), is the closest case we could find on point. In that case, the CAAF set aside the appellant's death sentence. The court concluded the CCA could order a rehearing on sentence or reassess the sentence and approve the mandatory life sentence. The court did *not* provide for the CCA approving a sentence *less* than the mandatory sentence.

Appellant's matters submitted pursuant to R.C.M. 1105 contain numerous letters and other mitigating material. However, as we see ourselves as lacking the authority to provide relief, we do not reach the question of whether appellant's sentence "should be approved" in the absence of an applicable mandatory minimum.

## CONCLUSION

Upon consideration of the entire record, the findings of guilty and the sentence are AFFIRMED.

Chief Judge RISCH, Senior Judge TOZZI, Senior Judge MULLIGAN, Judge HERRING, and Judge FEBBO concur.

---

[20] Under Article 60(c)(4)(B-C), UCMJ, the convening authority may set aside a mandatory minimum when: 1) the prosecutor so recommends based on the accused's substantial assistance in another case; and 2) as part of a pretrial agreement it is agreed that the dishonorable discharge will be reduced to a bad-conduct discharge.

[21] The mandatory minimum punishment contained in Article 56, UCMJ, is unique. The other mandatory punishments in the UCMJ are contained directly in their respective punitive articles and refer to the mandatory punishment the court-martial could direct. *See* UCMJ arts. 106 and 118. That is, by their own terms, the other mandatory minimums are a limit on the court-martial, not the CCA. By contrast, the language of Article 56(b), UCMJ, directs the "punishment" must include, in this case, a dishonorable discharge. Thus appellant's argument is weaker here than it would be with respect to the mandatory minimum sentence for premeditated murder contained in Article 118, UCMJ.

KELLY—ARMY 20150725

Senior Judge CAMPANELLA, concurring in the judgment, joined by Judge CELTNIEKS, Judge PENLAND, and Judge BURTON:

The majority reads the recent amendment to Article 56, UCMJ, too broadly, and this reading results in construing the court's Article 66, UCMJ, authority too narrowly. While the ultimate judgment of not providing relief for sentence appropriateness is sound in this case, the foundation upon which the majority judgment is based is flawed.

In concluding this court has no power to examine the sentence appropriateness of a trial court's issuance of a mandatory dishonorable discharge, the majority disregards three things. First, the majority disregards the language of the statute mandating a dishonorable discharge; second, they ignore the purpose behind the change in the statute; and finally they discount the precedents regarding the Article 66, UCMJ, authority of a service court of criminal appeal.

Article 66(c), UCMJ, provides this court "may affirm only such findings of guilty and the sentence or such part or amount of the sentence, as it finds correct in law and fact and determines, on the basis of the entire record, *should be approved*." (Emphasis added). The plain language of this provision effectively establishes a three-pronged constraint on our authority to affirm. To affirm the findings and sentence, we must be satisfied that the findings and sentence are: 1) "correct in law," and 2) "correct in fact." However, even if these first two prongs are satisfied, we "may affirm only so much of the findings and sentence as we determine, on the basis of the entire record, *should be approved*." *United States v. Nerad*, 67 M.J. 748, 751 (C.A.A.F. 2009) (emphasis added).

This power has been described as "an awesome, plenary, de novo power of review" that we may use to substitute our judgment for that of the trial judge. *United States v. Cole*, 31 M.J. 270, 272 (C.A.A.F. 1990). "A clearer *carte blanche to do justice* would be difficult to express." *United States v. Claxton*, 32 M.J. 159, 162 (C.M.A. 1991) (citations omitted) (emphasis added). "If the Court . . . in the interest of justice, determines that a certain finding or sentence should not be approved . . . the Court need not approve such finding or sentence." *Id*. While cases have addressed this power within the context of sentence appropriateness determinations, the plain language of the statute, and the quoted decisions, make clear this court's power is not limited to that application. The majority opinion, likely for the first time ever, finds there is now one area where our "carte blanche" is no longer accepted.

22

Prior to the recent amendments, the convening authority could reduce the sentence of an accused as a matter of clemency.[22]  Congress recently restricted the convening authority's power.  National Defense Authorization Act for Fiscal Year 2017, Pub. L. 114-328, § 5322 (2016) (Limited Authority to Act on Sentence in Specified Post-Trial Circumstances).  The new Article 60a, UCMJ, generally limits the convening authority's clemency powers to minor offenses and punishments.  *Id.*

Congress, however, neither explicitly nor implicitly, restricted our authority under Article 66, UCMJ, to review a mandated sentence of dishonorable discharge for sentence appropriateness and determine whether it "*should be approved.*"

Having thus reached the question the majority avoids, in this case a dishonorable discharge is appropriate and therefore *should be approved.*

FOR THE COURT:

MALCOLM H. SQUIRES, JR.
Clerk of Court

---

[22] This power included the authority to set aside the mandatory minimum punishment of life in prison required by Article 118, UCMJ.  As the majority points out, the mandatory minimum punishment in Article 118, UCMJ, is a limitation on the court-martial's sentencing authority, not a limitation on the convening authority or this court.